## Case No. 9,234.

### MASON et al. v. CROSBY et al.

[1 Woodb. & M. 342.][1]

Circuit Court, D. Maine. Oct. Term. 1846.

FRAUD—SALE OF LAND—EXAMINATION — MATTERS WITHIN VENDOR'S KNOWLEDGE—PART OWNER —RATIFICATION—LIABILITY.

1. Where a bill claims relief on account of fraud in a sale, it may be sufficient or broad enough, in form, to justify a decree against the sale, if a gross mistake appears.

2. But a sale will not, on account of such a mistake alone, be rescinded, if a party had full opportunity to examine the land sold, and did examine it.

[Approved in Shaddle v. Disborough, 30 N. J. Eq. 381. Cited in Greene v. Harris, 10 R. I. 384.]

3. Such an examination, however, will not prevent a recovery for fraud, if falsehood was practised in respect to some of the examination, and the quality of timber and size of the streams on it to float timber, or any matter more within the vendor's knowledge; and the purchaser, relying in part on the false representations, made only a slight and general examination himself.

[Cited in Smith v. Babcock, Case No. 13,009; Clark v. Manufacturers' Ins. Co., Id. 2,829; Simpson v. Wiggin, Id. 12,887.]

4. If such falsehood is practised by one of two owners of the paper title, and one of six owners in interest under subordinate contracts, it vitiates the whole sale: and the same result follows, if it was practised by a third person, who had a bond for a deed from some of the owners in equity, and who made the contract of sale, and the terms of which the owners of the paper title, and the grantors in the sale, adopted and carried into effect.

[Cited in Foster v. Swasey, Case No. 4,984; Iowa Economic Heater Co. v. American Economic Heater Co., 32 Fed. 737.]

[Cited in Pratt v. Philbrook, 41 Me. 133; Grant v. Beard, 50 N. H. 133.]

5. The grantors thus ratify the whole sale, and cannot take the benefit of it, by receiving the price agreed on, without being liable at the same time civiliter on account of the false representations made in order to procure that price and the sale.

[Cited in Veazie v. Williams, 8 How. (49 U. S.) 157.]

6. If the sale be rescinded, the grantors being the only respondents, are liable severally to refund the money each has received and retained for his equitable share in the premises; but are not responsible after the lapse of several years for the money, which was immediately paid over to the other equitable shareholders. Nor are they now responsible for that part of the money, which was paid to the agent for his services, and never came into their hands, when the lapse of time has been such that he is dead and insolvent.

7. A delay in rescinding a contract, and in instituting proceedings for a recovery of the money, though not so long as to be a technical or equitable bar, by the statute of limitations, to any relief, yet may be so long as to change the positions of the parties and their remedies over on third persons, and thus excuse them in equity for the sums paid over to such third persons.

[Cited in Packard v. The Louisa, Case No. 10,652; Smith v. Babcock, Id. 13,009; Almy v. Wilbur, Id. 256.]

[1 [Reported by Charles L. Woodbury, Esq., and George Minot, Esq.]

8. If a vendor or his agent make a false representation, which is material, it vitiates the sale, though it was not known at the time to him to be false.

9. The notes given to the respondents for the benefit of all interested and not yet paid by the plaintiffs, are to be refunded and cancelled so far as in their possession and control.

10. On doing this and making the payments aforesaid, equal in amount to their shares in equity, the plaintiffs must reconvey to the respondents respectively all interest in their shares of the premises, and another deed to them in trust for the other owners in equity, of all interest in so much of the residue of the land as the excess of the notes given up bears to the whole consideration.

11. Where one of the complainants had released all his interest in the land to the others, it was held to be no bar to a joinder of him in the bill to set aside the original trade and refund what had been paid.

[Cited in Veazie v. Williams, 8 How. (49 U. S.) 159.]

12. If the parties to the conveyance are made respondents, but not all those interested in equity in the land, it is no ground of objection to a recovery on the merits against the respondents for their shares.

This was a bill in equity, in behalf of Horatio Mason, David Daniels and Amos C. Leland, against James Crosby and Deodat Barstow. It was filed August 20th, 1841, and alleged, that on the 24th of August, 1835, the respondents were owners of about six thousand acres of land, called the "Munroe Gore," in the county of Washington and state of Maine. That about the 1st day of said August, they authorized Joseph Porter and William F. Boynton to give to one Nathaniel Fifield a bond or contract in writing, conditional to convey said gore, on certain terms therein mentioned; and this contract was given to enable Fifield to negotiate a sale for the benefit of Crosby and Barstow and others. It next averred, that Fifield, acting under said contract, and with the knowledge of Crosby and Barstow, and for their benefit, and for the purpose of selling the land at an exaggerated price, and to deceive the plaintiffs, did procure, by sinister means, Samuel Sawyer and Joseph Sawyer to execute certificates, dated April 20th, 1835, at Stephens, saying that the average quantity of pine timber then standing on said gore, would exceed six thousand feet per acre, and the spruce four thousand five hundred to five thousand feet per acre, and a large part of the timber was "handy to haul," or put in, and Samuel said he had "recently explored it," and that it was situated on the Schoodiac waters. It further averred, that these certificates were false, and so known to be to Fifield and the respondents, or might and ought to have been so known to the latter. The bill, after several other averments, either not material or not proved, alleged that Fifield further declared the timber could be cut and floated to market twice a year from said land, whereas in truth it cannot be done without great difficulty oftener than once in two years. The bill next charged that, influenced by

such false declarations and certificates, the complainants agreed with Fifield to purchase said gore at $8 per acre, and on the 24th of August, 1835, obtained a bond from the respondents to convey the same, (which was in terms at the price of $6 per acre) and gave a bond to them in return to pay for the same within eight days, one fourth in money, and the residue in three notes, one to be paid each year with interest, and all to be secured by a mortgage of the premises. That before the deed and notes were executed, and to induce the complainants to give the latter, Barstow, one of the respondents, averred, that there was more timber than the certificates stated, and that the land was worth $15 per acre, contrary to the truth, and they were thus persuaded, about the 1st of September, 1835, to complete said agreement, and pay the money and execute the notes, and take the deed of the land, as before mentioned. That this amounted in all to about $48,000, of which near $10,000 was then paid, and in the whole $22,000 has been paid in money, and the rest, viz., $26,000, or thereabouts, in notes to the respondents and others their agents and creditors. Fifield was averred to have received of this in money and notes about $12,000, or at the rate of about $2 per acre. The bill concluded with a prayer to have the money repaid, and the notes to be delivered up to be cancelled, and to pay all sums expended on the premises.

Among other averments in the bill was one, that Fifield was dead, so as not to be liable for prosecution; and in a supplemental bill, which the plaintiffs had leave to file and did file, October, 1845, it was further alleged, that Fifield, beside procuring and using false certificates by others, did himself make false representations as to the quantity of timber on said land, representing it to be twelve thousand feet of merchantable pine on one occasion, and eight thousand on another; that relying on Fifield's representations, they were induced to agree to look at the land, with a view of purchasing it, and started for that purpose, but by false statements of Fifield, were led to return without examining the premises, and to purchase the same on the terms before detailed; and in reliance on the falsehoods stated by him and by others through his procurement, they obtained the bond for the land, arranging with Fifield to pay $6 per acre to Crosby and Barstow, and the other $2 to Fifield, as his share or commissions in the purchase money for his agency; that Crosby and Barstow ratified all the doings of Fifield, and while the papers were preparing to complete the purchase, Barstow, in order to induce the plaintiffs to take the deed, averred that more timber would be found on the land than had been stated in the certificates, and that there was no doubt of the facilities in getting it off, and that the certificates could be relied on; whereas Barstow knew the falsehood of all this, and meant thereby to deceive the complainants.

It was further averred, that Edward Munroe, in 1830, purchased this gore of land of the state of Maine for $1,500, or about twenty-five cents per acre; and then sold a permit to one Todd, to cut the timber therefrom, for the sum of $1,500; and it was cut accordingly before 1835, not leaving thereon over five hundred thousand feet of both pine and spruce; and that all this was known or ought to have been known to the respondents.

The answer of Crosby alleged, that he had given no authority to Boynton to employ Fifield, nor had himself employed Fifield to sell the Munroe Gore; that he had no knowledge and gave no assent to Fifield's statements or doings, nor to the obtainment or use of the certificates of the Sawyers. That in the spring of the year 1835 he purchased one sixth of this gore of Edward Munroe, who had the equitable title; but the deed was given by the commonwealth of Massachusetts, and run to him and Barstow for the whole. That he never owned any more of the land than one sixth, and paid therefor $2.25 per acre. That before the purchase it was agreed by the parties to the same that he, Crosby, should own one sixth, Barstow and Boynton two sixths, and Stephen Smith three sixths. That before the sale to the plaintiffs, Smith assigned his three sixths to J. D. Wilson, Samuel Thurston, Brazier Barstow and Joseph Porter, so that when the sale took place, Crosby owned one sixth, D. Barstow one sixth, Boynton one sixth, J. D. Wilson one eighth, Thurston & Barstow, as a firm, one eighth each, or equal to two eighths, and Joseph Porter one eighth. That the respondent Crosby took no part in the negotiation for the sale of the gore, being much engaged in other business, and saying merely that he would sell his interest to any person for $6 per acre. That about the 24th of August, 1835, he understood from D. Barstow, that the plaintiffs were ready to give said price per acre, having been on the land and explored it to their satisfaction, and that all those equitably interested therein were willing the land should be thus sold. That he and Barstow therefore executed a deed of the same to the plaintiffs for that price, receiving $6,275.40 in cash, and the rest of the $35,352 in notes, payable as before specified, secured, except two, by mortgage, of the date of the 1st of September, 1835, and which notes he and D. Barstow agreed in writing to account for with the other owners, when paid, in the ratio of their respective interests. That he knew nothing of any false representations by any one, and authorized none; that he received only the sum of money and notes before named, and has divided them as agreed, except that two notes are still unpaid. That on the 4th of June, 1836, he sold to D. Barstow all his remaining interest in the notes, being $3,332, for $2,741 from which he has since made a further deduction of $1,000, and took a conveyance of real estate of little value for the balance. That he has had no interest therein since. The answer further averred,

that prior to the purchase by the plaintiffs, he was informed and believes that they explored the land in dispute, and were satisfied with it; that after the purchase they again visited the same, and continued to think well of their purchase; and that they have since stated the respondents to be innocent of any fault in the sale thereof. It then asked that the other parties in interest should be made parties to this bill, and subjected to pay over all they received if the complainants prevail; and averred, that the mortgage back of the land has not been foreclosed; that the plaintiff Daniels conveyed all his interest in the land to the other plaintiffs March 6th, 1837, and the others afterwards, in 1838, compromised the controversy with D. Barstow, and that no fraud had at any time been practised by him in relation to this subject.

Crosby filed an answer also to the supplemental bill, which, besides denying the material allegations, similar to those in the original bill, averred that, though Boynton was partly interested in said land, he was not authorized by the other owners to give any bond to Fifield or others for the sale thereof, nor does he know that Boynton had or used the Sawyer certificates to aid in the sale, and professes ignorance of most that is not denied. He averred, that he traded with the plaintiffs himself in person, and under a belief that they had explored the land for themselves, and was not aware that Fifield had employed any misrepresentations to, or made any agreement with, the plaintiffs; nor did he ratify or intend to ratify any such; nor did he or D. Barstow make any allowance to Fifield of $2 per acre for selling the land. Nor have the plaintiffs offered to restore it, nor has he been guilty in any way of any fraud towards them.

The original answer of D. Barstow stated, that he and Crosby jointly, in April, 1835, bargained with Munroe for the Munroe Gore, and Munroe obtained a deed thereof to them from the state of Massachusetts the 2d of May, 1835, at $2.25 per acre. The other averments were similar to those in Crosby's answer, except that Thurston and Brazier Barstow each owned one eighth, and that the respondent gave a verbal refusal to Boynton of his interest in the land at $6 per acre, but made no contract whatever with Fifield, nor authorized any. Nor did he know of any connection of Fifield with the sale, till a few days previous he understood Fifield had gone with the plaintiffs to explore the same; and on the morning of the 24th of August, 1835, Fifield told him that the plaintiffs had been on the land and refused to buy on certificates. The respondent then supposed that Fifield claimed to act under a belief that he, Barstow, was willing to sell his interest in the land at $6 per acre, and that Fifield was entitled to any sum over $6, which should be obtained; and the respondent was informed that Boynton and Porter had given to Fifield such a premium to sell the land, and that it had expired some days before the 28th of August, 1835. That hav-

ing stated his willingness to sell at this price, he was ready to do it, and that it was no higher than other lands were then selling for. That the plaintiffs applied to him that day to purchase the same at $6 per acre; said they had been on it, and the timber had not been represented too high, and, after consulting with the others in interest, he agreed to sell to them the same and did sell it, as described in Crosby's answer. He denies any knowledge of any false representations, or certificates, or making any such representations himself, but admits that he carried the deed from Crosby and himself to Boston, to deliver it, if the money was paid and the notes executed in conformity with the bond, though the business was not finished there, but afterwards at Bangor. That Mason, in October, 1835, subsequent to the purchase, went upon the land again, and expressed himself satisfied with the purchase, and, in April, 1836, paid the notes then falling due to Munroe; and the respondent, relying on the solvency and integrity of the plaintiffs, bought out, in March, 1836, Boynton's interest in the notes then unpaid, and the interest of Crosby; and that the plaintiffs signified to him no dissatisfaction with the purchase, till on the return of Mason from another examination of the land in October, 1836. That Mason then and since has proposed to have the respondents take back a part of the land; but did not pretend the respondents had wronged him, or that he bought except on his own knowledge, as the respondents had no personal acquaintance with the land and timber till the summer of 1837. That Barstow then examined the same, and found some good pine, an "immense quantity of spruce, a good deal of cedar," and "a large quantity of good farming land," and sold to Edward Holyoke, in March, 1838, one half the notes and mortgages at the rate of $3 per acre, and with reference solely to the value of the land and timber. That in July and August, 1838, Mason and Leland proposed to abandon the land to him, if all the notes were obtained and surrendered, but it was not done, as other notes existed than those over which he had control. That afterwards the other notes were obtained, and all placed in his hands to be thus surrendered, and he notified the plaintiffs to make out the release and receive them. But they neglected to do the same, and filed the present bill, without any further negotiations in respect to the subject. That he considered the whole matter to be thus compromised, but if it is not, prays that the other persons interested in the land be made parties.

Barstow filed also an answer to the supplemental bill, which repeats the material denials in his former answer, except admitting that Boynton may have given a bond to Fifield for the land at $6 per acre, but denies any agency conferred on Fifield to sell for the owners. It further denies, that Boynton had the certificates of the Sawyers, to use for the defendants, or that the defendants

authorized the use of them, or knew that Fifield had made misrepresentations, or knew that the timber had been cut from the gore by Todd, or that it was so cut to such an extent, as averred in the supplemental bill; though the respondent does not know, and never pretended to know, the exact quantity of timber on said land. That he knows nothing of Fifield's statements to the plaintiffs, and did nothing to secure $2 per acre to Fifield as agent, over and above the $6 per acre to be paid the owners; and that the bargain was made by him with the plaintiffs at Bangor, and that Fifield was not present, except once coming in on other business, and that he knows nothing of the terms agreed on by Fifield. That he and Crosby knew nothing personally of the land, but believed it to be heavily timbered, and nothing of its being cut off by Todd under a permit from Munroe, or of Fifield's representations about it. That Fifield did introduce the plaintiffs to the owners, as persons who wished to purchase, but left them to conclude a bargain; and, though once present, he took no part in the negotiation, and they knew nothing of his being entitled to the excess over $6, or had made any sale for them, and which they were adopting. That Fifield agreed to pay his expenses to Boston, and that he would see that the purchasers should pay him, when he, Barstow, went to deliver the deed, else the owners would not realize $6 per acre, and that Fifield did pay him. That he said nothing to the respondents or Bullard with a view to deceive, or which he did not then believe to be true, or to induce them to go on and complete the bargain. This respondent denied all fraud in the sale, or any mutual mistakes in regard to the timber, or any attempt to harass the plaintiffs with suits, but supposed all to have been adjusted. He corrects one mistake in his former answer, as to the first time when he heard that Boynton and Porter had given a bond to Fifield, and says it was a few days before the contract of sale with plaintiffs, August, 1835, and not after.

The evidence in the case was voluminous, and so much of it as is material to the facts found by the court, and legally proved and bearing on the questions of law settled, will be referred to in the opinion.

Mr. Bishop and Fessenden & Deblois, for plaintiffs.

W. P. Fessenden and Mr. Kent, for respondents.

WOODBURY, Circuit Justice. It is a matter of regret, that the bills in this case, both the original and supplemental, are not drawn with more precision. Several important matters are alleged only indirectly, and it is unusual that so many others, introduced with directness enough, are not even attempted to be proved. In the answers, also, some things are alleged, which are not responsive to the bill, and much difficulty is caused in settling first what is duly set out in both, and next what is properly proved of that which is duly set out. But from the whole it is undoubted, that the plaintiffs intend to claim relief on account of a fraud in the sale of the land in controversy, and not on account of a gross mistake. Whether, when fraud alone is averred and a mistake alone is proved, a recovery can be had on the latter ground—the allegations of fraud being considered broad enough to include a mistake—need not be here considered. See on this, Smith v. Babcock [Case No. 13,009], Oct. Term, 1846, Mass. Dist. Because, if there is not proved some falsehood or fraud, material in this transaction, it is doubtful whether the plaintiffs could recover for a mistake alone when they had so ample an opportunity to examine the land before the purchase, and undertook to make the examination, and expressed themselves satisfied with the result. On this, the case of Warner v. Daniels [Id. 17,181] may be regarded as decisive, and may be referred to for the precedents in support of that view. It was settled there, that though means of knowledge and explanation will usually defeat a rescinding of a contract for mere mistakes, yet it will not prevent a recovery for fraud, if that was practised in important particulars, relied on by the purchasers.

If the falsehood rendered the examination less perfect and full, or made the statements of the party to be in part confided in, as in respect to details, extending personal inquiry only to general matters and general appearances, the falsehood vitiates the whole. See cases cited in Smith v. Babcock [supra], and Tuthil v. Babcock [Case No. 14,275], (Mass.) Oct. Term, 1846. Thus if a vendor affirm the rent to be more than it is, it is a fraud for which he is liable; as that lies more within his private knowledge, even if the vendee made some further inquiries. Risney v. Selby, 1 Salk. 211; Pasley v. Freeman, 3 Durn. & E. [3 Term. R.] 51; 2 Esp. 572. Otherwise, if it was not so, and the truth could easily be ascertained. Harvey v. Young, Yel. 21; Leakins v. Clissel, 1 Sid. 146.

The next question then is, whether falsehood or fraud were practised in leading the plaintiffs to purchase the land of the respondents at the high price given. If they were, the sale was void, provided they were practised by either of the respondents, or by any person whom they previously employed as an agent to make the sale, or whose acts in negotiating the sale they ratified or adopted afterwards. They would be thus liable, if the plaintiffs relied mainly on the statements thus falsely made to them; though some examination of the premises and timber may have been attempted by them, but carried on slightly, or imperfectly, or erroneously in consequence of such reliance on what was false. See Warner v. Daniels [supra]; Harding v. Randall, 15 Me. 332; 2 Hayw. 240; Lit. Sel.

Cas. 218; 14 Ves. 7, 289; 3 Cow. 537; 2 Ves. Jr. 628.

Nor is it material in this case, whether or not either of the respondents or their agent knew to be false what was stated by any of them, provided he did state what was not true, and it was to a material point and was relied on. A vendor, in cases like this, is not in his own person or by another to throw firebrands, and say he is in sport, or make material statements which are untrue, and excuse himself by his own ignorance.

In relation to the evidence of fraud here, it is not of that plenary character which is found in some of the cases that occurred in the speculating era of 1835. Nor is it brought home so clearly to one of the defendants, Crosby. So far as affecting him, it is rather as a fraud in law and an avoidance of the contract in respect to him in consequence of fraud, committed by others, with whom he was associated in interest, and whose acts in making the sale he adopted, and hence is bound by their misconduct in respect to the sale, rather than from any personal behavior of his own, which is proved to be either dishonest or dishonorable.

What, then, in the first place, are the leading facts proved, from which to infer fraud? The great general fact, which is shown by full testimony, is, that the Munroe Gore, in April, 1835, cost the respondents only $2.25 per acre; and that this was two dollars per acre more than it cost Munroe only five years previous, with timber on it then, which had since been sold by him for a sum equal to all the original cost. The next fact of this character so proved is, that in only four months after their purchase, without making any improvements, the complainants were by some means induced to give $8 per acre for this same land, a price nearly fourfold what it had cost; and the respondents received of it themselves, in money and notes, $6 per acre, being a net gain in those few months of near three hundred per cent. Another of these facts so proved is, that from 1830 to 1835 this tract of land had been cut over by permission of the true owner, and all the timber which the licensee deemed worth cutting removed; and that when this sale was made, which was effected chiefly on account of timber on the land, nothing in fact remained there, except from a half to one and a half thousand feet to the acre. It will at once strike every observer of these general data, that there must have been some extraordinary mistake existing, or some extraordinary deception practised, in order to enable the respondents to sell land thus stripped of timber, to purchasers on account of the timber, and at such an extraordinary advance, within so short a period, on even the high price which the respondents had given. The times, then, were, to be sure, unusual, and almost insane. But, had the whole truth been known to the respondents, madness must have "ruled the hour," or they could not have given $8 per acre for land on account of timber, when only a half to one and a half thousand feet of pine existed to the acre, and that, as will soon be seen, could not then easily be got to market, nor much value be then attached to any spruce or cedar timber thus situated.

The next inquiry would naturally be, who could have any interest in misleading the plaintiffs to give so excessive a price, except the owners, who were to receive, or some agent or trustee in connection with them, who was to receive a portion of the consideration for his services in effecting such a sale? Accordingly, the position taken by the plaintiffs is, that the contract of sale, the price, and all the preliminary negotiations for the sale were made with Nathaniel Fifield, who had a bond for the land from some of the parties in interest. The form of this bond is not very distinctly proved, though its existence is by the evidence and circumstances satisfactorily shown. It is highly probable that the bond on its face either allowed Fifield to have the land on paying $6 per acre, if taken before a specified time, and which in that form was considered on this subject, in 1835, as constituting him an agent to sell at that price, and assumed this form in order that his statements as an apparent owner should have more weight than if he was an apparent agent merely. Or the bond on its face authorized him to sell for the owners at that price, he retaining for his services all he sold it for beyond that price. It is of little consequence which was the form, if it was in either. The evidence in support of its existence and tenor is not so distinct as it might be expected, if Fifield had not been dead, and hence he could not state the facts as a witness, or if made a party, disclose them in his answer to proper interrogatories in the bill. But I see no reason, except perhaps the subordinate interest of Boynton and Porter, who are supposed to have given the bond, why their testimony should not have been taken by the plaintiffs to prove the particulars, or at least been offered by the respondents, to rebut what is set up on that subject, if it could be rebutted. As the evidence now is, however, in respect to the existence and terms of the bond, one of the respondents, Barstow, admits in his answer, that before the sale he heard that two of the owners in interest, viz., Boynton and Porter, had given a bond to Fifield to enable him to sell. He admitted it also to Ware, and again in a letter, April 5th, 1837, he states, "We then told two of our company they had better put the land into the market at $6 per acre." He further states in that letter that a bond was given to Fifield by Boynton and Porter, that Fifield sold the land to the plaintiffs, and then introduced them to him, and a deed was given to them. And Jones understood from Barstow that Fifield said, in behalf of all the owners to Bullard, "that the land had been bonded to

Fifield, to enable him to sell it for Crosby and Barstow."

This evidence looks much like the giving of the bond to Fifield of the character named, and by arrangement of all, and like a subsequent execution of his contract, with full knowledge that Fifield had made it for them. The statements of one of a company so situated bind all. Van Reimsdyk v. Kane [Case No. 16,872]; 18 Wend. 354; 2 Hill, Ch. 109. In their answers, likewise, both of the respondents concede, that they had stated verbally, "any person should have a deed of the land who would give" therefor $6 per acre. Barstow, in his answer, says, he gave Boynton verbally the refusal of all his interest at that price, and supposes Fifield acted under a belief they would sell at that rate, and Fifield receive all he got over $6 per acre. It is to be remembered, in connection with this, that Boynton is the son-in-law of D. Barstow, and that the latter admits further in his answer, that the plaintiffs were introduced to him before the sale was completed by Fifield, as being the persons who wished to purchase the land; that Fifield informed him they had been to Bangor to examine the land, and that he understood from some quarter Fifield was to have any sum he could get per acre beyond the $6 paid over to the respondents. He admits, also, that Fifield paid him for going to Boston, and he said to Bullard, that he came there to close the delivery of the deed and the giving of the notes and payment of the money, or in other words, "for the purpose of completing the bargain for the purchase, as it had been agreed upon by the said Fifield." And it is stated in several of Barstow's own letters, offered in evidence, that the plaintiffs bought the land of Fifield and not of the respondents; and it was on that ground, chiefly, for some time Barstow hesitated to make any compromise with the plaintiffs. So he stated also to Ware. The testimony is explicit from several witnesses, that Fifield in fact made the negotiations for the sale, arranged the terms, fixed the price, and probably received the two dollars per acre over the six, which the plaintiffs agreed to give.

After all this, it is hardly permissible to deny that he acted prominently in the transaction; that his acts, so far as regards the sale at $6 per acre, were adopted or carried into effect by the respondents; that being thus perfected by them and not him, he never having obtained the title himself, nor conveyed it to the plaintiffs, all he did must be regarded in the light of an agent, and not of a principal; that his conduct for the owners was not only thus ratified, but had the previous express assent of two of those interested in the premises, and the subsequent knowledge of his participation, having the refusal and a bond, without disapprobation, by Barstow, one of the respondents and the acting owner, and the general assent of the other, Crosby, to a sale to any body who would give $6 per acre. He left the details of the business to be arranged by the others interested, on account of the pressure of his own individual concerns.

Under these circumstances, it has been settled in the case of Doggett v. Emerson [Case No. 3,960], that the owners cannot take the benefit of acts or negotiations like those of Fifield, without bearing the burthen of them, or any liabilities growing out of them, on account of any falsehoods or frauds of his that accompanied them and were material to the sale. 12 Mod. 490; 1 Bos. & P. 406; Story, Ag. 455; 1 Durn. & E. [1 Term R.] 710; 10 Mass. 327; 1 Bailey, Eq. 343. It has also been settled, in the first named case, that this agency, independent of the circumstances which exist here and did not there of an agency created, or known or recognized by some of the owners themselves as by Barstow, one of these respondents, holding with the other all the legal title, is to be inferred in law, with all its consequences and adjuncts, civiliter, if the owners choose to carry into effect the contract made by and under it. It is a subsequent ratification of it. Clark v. Van Reimsdyk, 9 Cranch [13 U. S.] 153; [Bank of Columbia v. Patterson] 7 Cranch [11 U. S.] 299; Long v. Colburn, 11 Mass. 98; Cushman v. Loker, 2 Mass. 106; Ward v. Evans, 2 Salk. 442; 1 Metc. (Ky.) 650; 1 Dess. 461, 470. See, also, Daniel v. Mitchell [Case No. 3,562]; 15 Wend. 114; 4 Durn. & E. [4 Term R.] 39, 41, 177; Lanborn v. Stetson [Case No. 12,291]; 3 Hill, 552. So it is settled there, that the owners need not have known the falsity or fraud in order to be charged with its civil consequences, if they undertake to receive the benefit of the contract made under it.

This is not a new doctrine, as some seem to suppose. In Doe v. Martin, 4 Durn. & E. [4 Term R.] 66, Lord Kenyon observes: "But it is said, that the transaction, as far as Martin was concerned, was fair and honorable, and that the fraud only consists in the misapplication of the purchase money; but, without imputing any fraud to Martin, and, indeed, it is negatived by the verdict, the maxim, that the principal is civilly responsible for the acts of his agent, universally prevails both in courts of law and equity."

But in addition to that principle for charging the respondents here, it is proved by two witnesses, that one of them, Barstow, and the one who seems to have been the active person in transacting the business, made, before the sale was completed, like representations with Fifield himself as to the certificates about the timber and the quantity of it, and that another equitable owner, Boynton, probably furnished those very certificates, which are charged in the bill to have been so untrue and deceitful. Besides this, three, if not more of the owners, were conusant to Fifield's acting as agent for the whole, and did not forbid him to go on, but rather acquiesced in the bargain he had made, and thus gave

him credit and standing. See on this, Pickard v. Sears, 6 Adol. & E. 469. More in illustration need not be now detailed after the numerous decisions in this court on questions resembling these. No progress can ever be made in disposing of cases of this character, unless we regard the decisions already made in this circuit on similar questions, as binding till reversed by the supreme court, or overturned by this court itself on a clear conviction of their error. Neither of these having yet happened as to what has been adjudged in Doggett v. Emerson [supra]; Warner v. Daniels [Case No. 17,181]; and several others, they are to be regarded as landmarks for the future, and it is considered not necessary on this occasion further to explain or to go behind them.

Next, in what did the falsity consist? In what particulars is the evidence as to falsity or fraud in material parts of this transaction, committed either by Fifield or any of the owners personally? It is sworn to, by two or three witnesses, that Fifield represented the certificates to be true and trustworthy, which stated the pine timber to be six thousand feet per acre, when in fact it did not exceed from a half to one and a half thousand, and that, "small, scattered and rotten."

One of the certifiers further stated, that he had "recently" explored the land to ascertain the quantity, when in fact he had not been on it for several years, and then all which possessed any value was in progress of being cut off, and when in fact the other certifier had not examined at all over half the land. Both the certificates, also, instead of being trustworthy in other respects, had been procured by Darling under a promise from Smith, who held a bond of the land at $1 per acre, that he should have one quarter part of the interest in the bond if he would assist him in selling it. Darling is also one of the certifiers to Sawyer's character, as if disinterested, when in fact he was secretly interested in the sale of the land to the extent of one fourth, and is proved to have been afterwards paid one fourth of all the increased price thus obtained. It further appears that these certificates were sent by Darling to Smith, in April, 1835, and that he, Smith, sent them to Boynton, one of the owners at the time of this sale, and the son-in-law to Barstow. The latter admits he saw them in Boynton's possession, who being part owner by sub-contract, and the one who gave the bond to Fifield, doubtless delivered these certificates to him with the bond. They had been so effective as to help Smith sell the gore at $2.25 per acre, for which he gave only $1, and enabled Boynton and his associates to sell for $8 in gross or $6 net, what had cost them only about one third of the last sum. It was furthermore shown, that Fifield himself had represented to different witnesses the pine timber to be eight, ten, and twelve thousand feet per acre, being willing to guarantee ten, and

the facilities for getting the timber off as good, and so good that it could be run twice a year to market, which would greatly increase its value, and especially impart all the value which the spruce possessed. When in fact it is now proved to have required usually two years then to get the timber to market, and so continued, till some improvements were since made in the stream at a considerable expense. It was next shown specially, that Barstow, one of the respondents, in person confirmed most of these statements, and urged the truth of these certificates on the plaintiffs, as a reason for completing the sale. He told Jones, that the quantity of timber was double what the certificates stated according to his belief; and the stream of water good to run the timber to market twice a year. Bullard testifies to similar statements of Barstow.

What is the result of all this? It is summed up truthfully by Barstow, in October, 1836, in his letter to Mason, in these words: "We all now believe that you have been basely imposed upon in the purchase of the Munroe Gore."

But other objections have been urged to a recovery here; because other persons interested in the land beside the respondents have not been made parties. It is to be remembered, however, that the respondents alone bought the land of Munroe, and that the title was vested in them alone by the deed, and by them alone conveyed to the plaintiffs. Under these circumstances the bill can well be sustained against them alone. West v. Randall [Case No. 17,424]; Wormly v. Wormly, 8 Wheat. [21 U. S.] 421, 451, and note. But how much, under the circumstances here, must be paid back by them on a rescinding of the sale, in consequence of such sub-contracts, is a difficult question, and will be soon considered. See Doggett v. Emerson, May Term, 1846, on the master's report [Case No. 3,962].

In actions on contracts, which form the nearest analogy to the present proceedings, an omission of a person, who ought to be a co-defendant, cannot be taken advantage of except by plea in abatement. Powers v. Spear, 3 N. H. 35; 1 Chit. Pl. 29; 1 Saund. 291b, note 4, and 154, note; Nealley v. Moulton, 12 N. H. 485. Dormant partners, also, are not necessarily parties in a suit, and are not allowed to become so to defeat the action. De Mautort v. Saunders, 1 Barn. & Adol. 398. Nonjoinder of a defendant, can be objected to only in abatement. 5 Coke 119; 1 Saund. 154. Here the plaintiffs might perhaps have made all parties, who got the money and had any kind of interest at the time of the sale in its proceeds, and, on some accounts, that course would have been preferable. But it is very evident, that they were not obliged to prosecute any but those who conveyed to them, who alone contracted with them, and who possessed the legal title to the premises, leaving all subordinate interests and equities to be settled among those who were the parties to

them, or to effect only the amount to be refunded by the respondents, and not their liability.

Another objection is, that one of the plaintiffs has conveyed all his interest in the premises to the other complainants. But it does not follow from this, that he is not entitled to join in bringing the suit for the benefit of his grantees, the original cause of action or complaint having arisen to him, and the remedy being properly in his name. Nor does his conveyance to them prevent them from releasing, or reconveying to the defendants all the title which came from them, it being still all in two of the plaintiffs, if not in the three equally. Such objections going to form rather than substance, should be taken earlier than pleas to the merits, and especially are they untenable if the decree can be so made as to prevent any injustice if there be a misjoinder. 4 Younge & C. Exch. 557; 1 Beav. 277. Again, if one applies for an injunction and relief against a judgment for land, to which he had after the judgment released his interest, it has been held to be no bar, as it is a naked equity, and nothing passed by the release, as he then had no interest and could have none till created by a decree of a court of equity. Dunlap v. Stetson [Case No. 4,164].

The length of time from this transaction, in August, 1835, to the filing of the bill, in August, 1841, is likewise urged against any recovery here. It would operate against the present proceeding, if not bar it, under some circumstances, unless satisfactorily explained, though six years had not quite elapsed before these proceedings were instituted. Because, when a party has taken possession of property purchased, and discovers fraud in the sale, which he thinks vitiates it, he ought, as a general rule, to return, or offer to return, the property speedily, so as not to change in any material respect its condition or the rights of the other party before rescinding, and so as not to deprive him of remedies over, which would have been good if he had been called on earlier. Here, however, the fraud does not appear to have been discovered before the autumn of 1836, and from that time till 1839, there is evidence of negotiations and mutual propositions to compromise the dispute, and an impression that it was or would be compromised till the bill was filed in 1841. Indeed, an actual compromise is set up in the answers of Barstow, as having taken place, and been confided in by him, till these proceedings were instituted. And though no evidence has been offered proving it in such manner as to be binding in law or equity, yet it is admitted by the respondents, and accounts in some degree for the lapse of time without suit after the fraud was discovered.

Another reason, probably, why the plaintiffs need not be so active in reconveying or bringing a bill in this case is, their impression that the respondents had foreclosed their mortgage and taken possession of the premises; and though the foreclosure is denied, it is admitted by Barstow that he had entered on the premises, and sold half of them to Holyoke, or half of the mortgage and notes as early as 1838. See on this, Warner v. Daniels, before cited, and 20 Johns. 585; 2 Schoales & L. 635.

There is one view, however, in which this length of time, though not barring the liability of the respondents, may have an equitable influence on the amount they are to refund, and I will consider this when giving directions concerning that amount. There are, also, several minor questions which have been started in argument, as to the competency of some of the witnesses, and the irresponsive character of some of the answers, which on this view of the evidence it is not necessary to discuss or settle.

On the question, then, of the liability of the respondents, my opinion is, that the sale of the land in question was void on account of the false and fraudulent representations which accompanied it, as they were very material in their character, reaching nearly the whole value of the premises, and were much relied on, notwithstanding the imperfect exploration for only one day or less, which was attempted by the plaintiffs. It must be set aside, therefore, and the consideration paid for it be refunded so far as hereafter pointed out, and the land reconveyed to the respondents. All this can be inquired into and reported on as to particulars, by a master in chancery. But in order to prevent difficulty and delay before him, and after his report is made, it is proper to consider two questions more at this time, in respect to the amount to be refunded.

One is, the influence which the length of time, under all the circumstances of this case, ought to have on the amount which these defendants should in equity refund. It has already been stated, that it is not such as to bar this liability, and I see no reason, therefore, why it should prevent the recovery of the whole amount of money which was received by themselves of the plaintiffs, either at the time of the sale or since, and retained for their own use. But as the money received by them then in equity belonged to others, who by sub-contracts were entitled to portions of it, and those portions were paid over before this bill was instituted, and the plaintiffs knew of the existence of such sub-contracts, and yet did not make the parties to them parties to the bill, nor prosecute the respondents at an early day, so as to enable them, if liable, to have a useful or seasonable remedy over on those sub-contractors, I am inclined to think this injurious neglect in the plaintiffs should prevent them from enforcing a repayment from the respondents beyond the amount of money which they have retained for their own shares. Called upon by this bill to exercise extraordinary powers on the ground alone that it is equitable, we ought to exercise them no further than is clearly equitable; and the parties beyond that, if left as they stand

at law, have no reason to complain. In respect to the notes, received by the respondents from the plaintiffs, and still retained in their possession, or which were under their control when the bill was filed, I think they should be required to surrender all of them, as the lapse of time has not interposed so as to change the character or position of the respondents concerning them. These notes run to them, and were to be kept and collected by them in trust for all the shareholders.

The next question connected with the amount proper to be refunded, grows out of the sum and notes received separately by Fifield, the agent, and which did not pass originally into or through the hands of the respondents. If Fifield was a party to the bill, the proper rule would be usually not looking to the exception here on account of the length of time operating as to sub-contracts, to charge him and the other respondents with such portions as they respectively received of the money and notes, and to require a reconveyance of the premises by the plaintiffs, on being repaid such sums as they had advanced, and on having their notes, which had not yet been paid, returned. There is no agent here, through whose hands all the money and the notes passed, so as to make him responsible in the first instance for all, and to be aided afterwards by the others, who are parties to the bill according to the portion each received, as in Daniel v. Mitchell [Case No. 3,562], and Doggett v. Emerson, before cited. But Fifield not being a party, Crosby and Barstow can alone be charged, and the amount they can be required to pay in respect to him, is a question of some difficulty. Fifield is not a party as Emerson was in Doggett and Emerson, and as Todd was in Daniel and Mitchell. Nor did the money and notes, received by Fifield, pass through the hands of the respondents, or the latter run to the respondents, as they did in the former case, if not in the latter, and which seemed to be considered an essential ingredient to charge them when one of the agents, such as Williams, in Doggett and Emerson, was not a respondent in the bill. Besides this, there is no admission in either answer, that money or notes were actually given to Fifield, though it is manifest from them and the evidence, and especially the letters in the case, that Fifield acted as an agent in the transaction, and indorsed some of the notes, and the bill states the amount given to him. The answers deny any knowledge that Fifield received $2 per acre, or any other sum, for his services, except by hearsay, or that the respondents in truth agreed to pay or allow any sum whatever for his agency aforesaid. The length of time, then, during which the plaintiffs neglected to prosecute their claims, is a decisive bar to making it equitable for them to account for Fifield's money or notes, by construction, when they never had either, nor can control either. The money and notes to Fifield might have been obtained back,

had the respondents been called on and charged for them early. They went into the possession of Fifield at once, and from the plaintiffs, not the respondents; and hence with the knowledge of the plaintiffs, that they were in his possession. The respondents laid by and did not sue till, according to the evidence, Fifield had become insolvent and died, and after that, to charge them for his receipts, when the remedy over would be worthless, and has become so probably by the neglect of the plaintiffs, would be any thing but equitable. The most obvious remedy for them at all would have been against Fifield rather than the defendants. I must hesitate, then, under these peculiar circumstances, to charge the defendants with any money averred to have been paid to Fifield, as their agent, in part consideration for the land, or on account of any notes so given to him.

Some question arises, whether the sum to be refunded by the respondents is to be done jointly or severally. The deeds to and from them seem to have been joint, as were the notes to them. But they were acting for themselves and others, owning, in fact, separate shares; and as their shares are recognised in these proceedings as severed from the rest, in the amount to be refunded, it may be proper that a severance should be made between themselves in the decree. But this point has not been discussed, and before drawing up a decree we will hear the counsel on it for both parties. It will now be entered for the plaintiffs, on the principles here laid down, and the case submitted to a master, to make the computations necessary and the inquiries indicated. There are also some questions of costs for amendments and filing supplemental bills, which the counsel will please to present early, so as to have them settled by the time the case is ready for final judgment on the report.

[NOTE. District Judge Ware delivered an opinion to the same effect in this case. Case No. 9,235.

[Subsequently the master filed his report, to which exceptions were taken. The exceptions were heard and overruled in Case No. 9,236.]