CORNELIUS SHADDLE

*v.*

HENRY DISBOROUGH.

A person agreed to exchange his farm for city lots, but made no effort to ascertain their value, and there was no misrepresentation by their owner. On a bill for specific performance, he set up as a defence that they were worth less than he supposed. Their value not being so inadequate as to be evidence of fraud,—*Held*, that the defence could not prevail.

Bill for specific performance. On final hearing on pleadings and proofs.

*Mr. R. V. Lindabury*, for complainant.

*Mr. H. M. Gaston*, for defendant.

THE CHANCELLOR.

The bill is filed for the purpose of compelling specific performance by the defendant of an agreement in writing made between the parties on the 12th of June, 1877, by which the defendant agreed with the complainant to convey to him in fee-simple, by deed of warranty, with full covenants, free from all encumbrances except a mortgage of $1,000, on or before the 25th of June then next ensuing, his farm of about one hundred acres in Somerset county, for the consideration of $8,000. In satisfaction of that price he was to accept

Shaddle *v.* Disborough.

from the complainant two lots of land on Lexington avenue, in Jersey City, each twenty-five feet front by one hundred feet in depth, being lots Nos. 58 and 60 on the Jersey City map. On one of those lots were a dwelling-house and barn and other improvements. The property was, according to the agreement, valued at $4,500, and was to be taken subject to a mortgage of $2,000 thereon, but all interest on the mortgage and taxes on the property were to be paid up to the time of transfer. The complainant was also to pay him $500 in cash on or before the passing of the title, to give his bond, to be secured by mortgage on the farm, for $4,000 with interest, and to pay off the $1,000 mortgage which was on the farm, on the 1st of April, 1878. The agreement, as drawn and signed by the defendant, provided that the father of the complainant should be surety on the bond for $4,000. That provision was inserted without the complainant's authority, consent or knowledge, by the agent who negotiated the exchange, and who drew the agreement. The complainant, when the agreement was presented to him for signature by the agent, refused to sign it unless that provision was erased, and the agent claiming to have authority from the defendant to erase it, did so accordingly. The time fixed in the agreement for paying the money and exchanging the papers, was June 25th, 1877, between the hours of nine o'clock in the forenoon and six o'clock in the evening, and the place was the agent's office in Somerville. The complainant attended there at nine o'clock in the forenoon of that day, prepared to perform his part of the agreement so far as it was to be performed on that day. The defendant came there, but would not say whether he intended to perform the agreement or not. He left the office, saying that he would soon return and would then be ready to talk to the complainant. In about an hour he returned and said he was not yet ready to give the complainant an answer, but was having the matter looked into, or something to that effect. He went away again, but did not return. His attorney came about three o'clock in the

afternoon, and said he was there on the defendant's behalf, and that the latter would not return.   The complainant then tendered the sum of $500 to the attorney, with a deed conveying the Jersey City property to the defendant, and a bond and mortgage on the farm, in favor of the defendant, for $4,000 and interest, and at the same time exhibited receipts for the taxes on the Jersey City property, and demanded a deed for the farm.   The attorney took the papers and examined them and returned them to the complainant, finding no fault with them except that there was no receipt for a water rent of $12; that the complainant, explaining that it was only through inadvertence that it was not then in his possession, offered to obtain at once if the attorney desired it.   The attorney thereupon made no further objection on that score, but drawing from his pocket an abstract of the title of the Jersey City property which had been lent to the defendant by the complainant when the contract was signed, to aid him in investigating the title to the property, said there were some things in it which he did not understand, and he then invited the complainant to accompany him to his office that he might make some investigation there in regard to it.   The complainant went with him accordingly, and, while there, again made the tender, whereupon the attorney said he did not think the title was quite right, to which the complainant replied that it was correct, and asked him if he, as the defendant's representative, declined to perform the agreement.   To this the attorney replied that there was one water rent receipt missing.   The complainant thereupon offered him $50, to be held as security that he would obtain that receipt.   The attorney declined to take the money, and then said that a Mr. Mooney, a land agent, said the Jersey City property was not worth more than $2,500, and the attorney added that the defendant would not make the exchange at all.   The next day the complainant obtained the missing receipt, and two days thereafter showed it to the defendant and his attorney, and, offering to specifically perform the contract, requested

the defendant to do so, but the latter refused, saying that the Jersey City property was not worth $4,500, and that his attorney then had the matter in charge and it "would have to go through."

The defendant, by his answer, sets up, by way of defence, the alteration of the agreement by striking out the clause therein providing that the complainant's father should be surety on the bond for $4,000; that the complainant induced him to enter into the agreement by falsely representing to him that the Jersey City property cost him $4,500, and that his equity of redemption therein was worth $2,500, and that he, the complainant, could get $30 a month rent for the property; whereas, the defendant had, since the signing of the agreement, discovered that $20 a month was the full rent that could be reasonably obtained for it; that the complainant suppressed the fact that the water tax of from $12 to $18 a year was to be paid out of the rents, and was a lien on the property; that after paying interest on the mortgage on the property, and the taxes, there would remain but little, if anything, to the owner, out of the rents after paying for necessary repairs; and that the income is uncertain, depending on the obtaining of a tenant for the property; that the bargain is a hard and unconscionable one, and ought not to be enforced; and that the agent of the parties, on or about the day on which the contract was signed, told the defendant that the complainant was then painting and making repairs on the property, as he had been informed by the complainant, to the amount of from $200 to $225, whereas no considerable repairs were then, nor have any since, been made on the property.

The conduct of the complainant in the entire transaction which is the subject of investigation in this suit, appears to have been entirely fair, frank and upright. He does not even appear to have been eager to make the exchange. He did not seek out the defendant. The agent, Van Doren, in whose hands the defendant had placed his property for sale, brought it to the notice of the complainant. The com-

Shaddle *v.* Disborough.

plainant, at first, proposed that the defendant should go and examine his property, as a preliminary to any negotiation. The defendant did so, and says that he " was not at all pleased with the property; that it was very uninviting, in a miserable condition, and looked as if it had a very hard tenant in it." When asked why he did not then make a longer examination of it, he says : " I saw enough to satisfy me, and I rather came to the conclusion that I would not be very apt to trade for it." The complainant says the defendant examined the ground, asked the size of the lots, went into the stable, and into one room of the house, and that when he came out the complainant asked him if he had not better examine the property all through, to which he replied, no, he had seen enough; that the defendant then asked him about the rent the property would bring, and that he told him that it rented in the spring of 1874 for $35 a month; that in the spring of 1875, his agent, Mr. Garrabrant, had let it at $37.50 a month; that that tenant had left the house on account of ill health; that he had been ordered to leave Jersey City because the air there was too strong for him, and that Garrabrant had put in the tenant who was then in at $20 a month. The complainant says that the defendant then said to him : "Now that I have come down and have seen your property, I would like you to come and see my farm, and we will see what we can do." The complainant, subsequently, in accordance with this invitation, went, with his wife, to Somerville, to look at the defendant's farm. He says that, after examining it, he said to the defendant : " Now that you have seen my property, if you are willing to take it in exchange at $4,500 I will give you $7,500 in this way: my property, subject to a mortgage of $2,000 on it, and a bond and mortgage on the farm for $5,000, and $500 cash." He says that the defendant said he thought that was not enough, and then asked him what were the expenses of the complainant's property, what were the taxes, &c.; that he then told him that the city taxes were fifty-odd dollars a year; that there were

Shaddle v. Disborough.

water taxes of from $12 to $18 a year, and that he paid an
agent five per cent. for collecting the rent; that the defend-
ant still insisted that the complainant did not offer him
enough, and the latter, after consulting with his wife on the
subject, advanced his offer to $8,000. The defendant thought
that the amount was not sufficient, but the complainant
declined to give more, and left him, saying that he might
consider the matter, and if he desired to trade on the basis
of that amount, he might inform him through Van Doren,
the agent. The agent subsequently told the complainant
that the defendant wished to see him again on the subject,
and the complainant again went to see the defendant, at
Somerville, where the latter was then living. The defend-
ant again spoke of the rents of the Jersey City property,
and the complainant then told him that he had notified his
agent, Garrabrant, to dispossess the tenant, and the defend-
ant then said that he thought that if he could get $300 a
year for the Jersey City property he thought he would be
satisfied. He still insisted on a higher price than $8,000
for his property, and the complainant offered him $8,250, of
which $250 were to be paid in cash, the defendant was to
take the Jersey City property subject to $2,000 mortgage for
$2,500 more, and the complainant was to give a mortgage
on the farm for $5,500. The defendant did not then agree
to accept this price, because he thought it was not enough,
but expressed his desire that the complainant, who intended
to live on the farm if he obtained it, should have it rather
than any speculator, and stated a condition relative to the
possession by his son of the farm for the season in case he
should make the exchange. No agreement was then made.
This last interview was in the latter part of February, 1877.

On or about the 19th of March following, the com-
plainant was informed, by letter from Van Doren, that the
defendant, through Mooney, the land agent before men-
tioned, had agreed to exchange his property for the equity
of redemption of two houses and lots in Irvington, and a
mortgage of $6,000 on his farm. From that time until the

following May or June the complainant heard nothing more on the subject. Then, Van Doren, at the defendant's request, wrote to him that the proposed exchange for Irvington property had not been carried out, and that the defendant would like to have the complainant take the farm if he would give $500 more. The complainant then wrote to the agent (and the letter was shown by him to the defendant) that he would remember that he had said, when he left him in Somerville, on the occasion of the last interview on the subject of exchange, that he would never do so well again, but added that he would exchange on the basis which he had mentioned when in the defendant's farm-house, $8,000 for the farm, the Jersey City property to be taken at $4,500. Van Doren communicated this to the defendant, who then remarked that it was $250 less than the complainant had offered before, and said he could not do it, but that he would take $500, and not go and see the Jersey City property again. Van Doren, on the 4th of June, 1877, communicated this, by letter, to the complainant, who replied, declining to give more than $8,000, and, according to Van Doren's recollection, told the latter to tell the defendant to go and look at, and find out all about the Jersey City property. Van Doren informed the defendant of this answer, and the latter then told him he meant to make the exchange, but that Van Doren must not tell the complainant, but must try to get $500 more out of him if he could. Van Doren made an effort to that end, but was unsuccessful, and so informed the defendant, who then agreed to make the exchange. Van Doren drew the contract, and inserted in it the provision that the complainant's father should be surety on the bond to be given by the complainant. This was done merely in consequence of a remark made to Van Doren by the complainant's father, withont the knowledge or procurement of the complainant, that if the defendant desired it, he would be surety on the bond to secure prompt payment of interest. His reason for making this offer was his desire that the complainant, who was engaged in commercial

Shaddle *v.* Disborough.

business, should buy a farm for a home. When this provision was written in the agreement, Van Doren expressed a doubt whether the complainant, who knew nothing of that matter, would consent to it, to which the defendant replied, that he did not ask it, and that Van Doren could either put it in or leave it out; that the farm was sufficient security. Van Doren took the contract to the complainant on the same day. The latter, on reading it, refused, as before stated, to sign it, because of the provision just referred to, saying that he never allowed anybody to go on his paper. Van Doren then replied: "All right. Mr. Disborough consented that I should scratch that out." The complainant then queried whether to erase it would not invalidate the agreement, to which Van Doren replied, that it would not, seeing that the defendant had consented that the provision be expunged if the complainant desired it. The sentence was then erased, and the complainant signed the agreement. The next morning Van Doren saw the defendant, and informed him that he had erased the provision in regard to surety on the bond, to which the defendant replied, expressing his assent, and adding that he had not asked for security.

Though the answer sets up this alteration as a defence, it is very clear that the defendant consented to it. He, in fact, had never asked for a surety, nor had it been suggested by the complainant, or on his behalf, nor by the defendant. Van Doren inserted the provision without authority, and the defendant knew it. When the former expressed a doubt whether the complainant would be willing to let the provision stand, the defendant at once consented that it be expunged if the complainant should desire 'it. And the next morning, after the agreement had been signed, when he was informed that the provision had been struck out, he expressed his assent. To the complainant's solicitor, who called on him, at the complainant's request, to ascertain his reason for saying that he would not perform the agreement, he said he did not refuse to comply on account of the alteration, and admitted that the alteration was made with his

consent, and added that he cared nothing about it, but had
other grounds of refusal.   And finally, when, on the day
when the papers were, according to the agreement, to be
exchanged, he referred to the alteration, the complainant
asked him if he refused to comply on that ground, he replied
that he did not.    That defence is wholly untenable.

The misrepresentations set up in the answer are, that the
equity of redemption in the Jersey City property was worth
$2,500, whereas, in fact, it was not worth more than $500;
that that property cost the complainant $4,500, whereas he
obtained it by exchanging for it other real estate, and
paying some money, in 1873; and that, though its price in
the exchange was nominally $4,500, it was, to a great extent,
fictitious; that the complainant could get $30 a month rent
for it, whereas $20 a month is a full rent for it, and that he
suppressed the fact that the water tax was to be paid out of
the rent.

· As to the first of these alleged misrepresentations:   It
does not appear that the complainant ever stated to the
defendant that the equity of redemption was worth $2,500.
What he said was, that the property had cost him $4,500,
and was mortgaged for $2,000.   He proves by James L.
Robertson, of whom he got the property, that Robertson
sold it to him for $4,500.   Robertson swears that he con-
sidered it the same as a cash sale; that, though he was paid
by exchange of property for it, he would not have taken less
than $4,500 in cash; that he bought it in 1870, and paid
$4,000 for it; that the person of whom he bought it occu-
.pied it as her residence; that he himself resided there so
long as he owned it, and spent from $500 to $800 in
improvements on the property to fit it for his own use after
he became the owner of it, and that he asked $5,000 for it
for some time.   He resides in Jersey City, and says that the
property is now worth, in his opinion, from $4,500 to $5,000.

The defendant does not, in his testimony, say that the
complainant represented to him that the equity of redemp-
tion was worth $2,500, or any other sum, but says that the

Shaddle v. Disborough.

latter put in his property at $4,500. Though he says that when on the renewal of the negotiations, after he had failed to make the exchange for the Irvington property, Van Doren handed to him and permitted him to keep the complainant's letter before referred to, in which the complainant proposed that Van Doren and the defendant should go to Jersey City and see the complainant's property, he told Van Doren that he did not think that was necessary, that, if he traded with the complainant, he would so at the latter's valuation of the property, Van Doren swears that he did not say so, but told him to try to get the complainant to give more than he then said he was willing to give for the farm. Nor is it probable that he did say so; for it appears that it was at his own instance that negotiations with the complainant were resumed. He admits that he told Van Doren at that time that he would like to deal with the complainant. There is nothing in the case to corroborate him in the statement that he said to Van Doren that he proposed to rely on the statement of the complainant as to valuation. The complainant does not appear to have been anxious to make the exchange. The defendant had seen the Jersey City property, and though, according to his testimony, he was not satisfied with it, he does not appear to have ever said so to the complainant or to Van Doren. The complainant appears to have insisted that the defendant should come to a conclusion for himself, on examination and inquiry as to the Jersey City property, and seems to have refrained from making any representation on the subject of value. He said that the property had cost him $4,500, and in the agreement the property is said to be " valued at " that sum. The defendant testifies that the complainant never asked him to accept or rely upon his estimate of the value of the property. There can be no doubt, that had the defendant told the complainant, or given him to understand that he intended to deal with him on the assumption that the complainant represented the property to be worth $4,500, the agreement for exchange would not have been made. It is enough to

say that there is no proof that the complainant made the alleged representation.

The defendant's account, in his testimony, of his discovery that the Jersey City property was not of the value which he says the complainant represented it to be, is at variance with the statement of his answer on that head. In his testimony he says that the next day after the contract was signed, Mooney, who was then on his way, with his wife and child, to Lamington, called at his house, not on business, but as a friend, and said that, if convenient to the defendant, he would call again the next day, on his return. The next day he came with his wife and child, and stayed all night at the defendant's house. The defendant says that he then asked Mooney to go and see the Jersey City property and ascertain its value, and that on Monday following, the 18th of June, six days after the day on which the contract was signed, he received a letter from Mooney, saying that he had been on the preceding Saturday to see the property, and that, in his opinion, it was not worth the amount of the mortgage on it. He says that the next morning he went down to Van Doren's office and told him he wanted to see the agreement; that Van Doren said it was not there, but at his house, and promised to send it to him the following morning; that when it was brought to him the next morning, he found, to his surprise, that it had been altered by the erasure of the before-mentioned provision for security, and that a day or two afterwards he spoke to Van Doren on the subject of the alteration, and asked him what business he had to make it, and that Van Doren replied that the defendant had consented to it, which he then denied. In his answer, which is under oath, the defendant says that, a few days after the agreement was signed, he obtained a copy of it from Van Doren, and then first learned of the alteration; that that first excited surprise and alarm in his mind, and led him to send a competent agent to learn and report the value of the property. When asked in his testimony to account for the striking discrepancy in these statements, he admits his inability to do so. The difficulty increases when

Shaddle *v.* Disborough.

it is considered that it seems clear that he was apprised of the alteration on the next morning after it was made.

Van Doren swears that the defendant never told him that he did not mean to carry out the contract until the Saturday next preceding the Monday on which the papers were to be exchanged, according to the agreement; that he then said he was " sick," but said nothing about misrepresentation by the complainant, and that he said that he would pay something to be released, but did not name the sum. Van Doren explicitly swears that the defendant did not, prior to the 25th of June, say anything about any misrepresentations of the property by anybody.

That the defendant had ample opportunity to examine the property and make inquiry in regard to it and its value, abundantly appears, and, indeed, is not denied. It is also clear that the complainant avoided making representations as to value, and insisted that the defendant should satisfy himself on that point. So far from preventing or forestalling inquiry, the complainant urged the defendant to make it. Under such circumstances the latter has no just cause of complaint, if the property proves to be less valuable than he supposed; for if he suffers loss it is the consequence, not of the complainant's representations, but of his own disregard of the dictates of common prudence, against which he has no more right to expect that this court will protect him than he would have to expect that it would relieve him from a contract for the sale of his corn at half the market price, merely because when he sold it he did not know and would not take the trouble to inquire what the market price was. *Mason* v. *Gosby*, 1 *Woodb. & M.* 342; *Warner* v. *Daniels*, *Id.* 90; *Hough* v. *Richardson*, 3 *Story* 659.

Nor were the complainant's representations as to the rent of the property false, or in any way fraudulent. The defendant, indeed, swears that the complainant told him, when he went to see the Jersey City property, that he had rented it the then last spring (1876), for $40 a month, and had a very good tenant, referring to the invalid before mentioned; and

his son testifies that the complainant told his father, at the farm, that the rent was $40 a month; but, on the other hand, the complainant positively denies having said that he had received $40 a month rent, and he is corroborated by Van Doren. They say he said it was $37½. There is no evidence that he did not receive that amount of rent as and when he said he did. It is important, in this connection, to turn to the answer. It does not allege that the complainant represented that he received $40 a month rent, nor even $37½, but $30. In the letter of June 2d, 1877, which is produced from the custody of the defendant, the complainant says that his property is rented for the then coming year at $20 a month, and he adds that he could have got $30 if he could have got the tenant out, but that the latter gave him trouble, and it was the 1st of June before he could let the house. The agent who has the property in charge, letting it and collecting the rents, says that, in his opinion, it ought to rent for $400 a year, or $33.33 a month. The complainant swears that the defendant told him, in the latter's house, that if he could be assured that the property would rent for $300 a year he would be satisfied; that he then told him that it had been rented for $35 a month, and had been rented for more, and he had no doubt it could be again rented for that sum, and said that the amount for which it was then rented, $20 a month, was less than that for which it had been rented. It is proved that $30 a month (the rent mentioned in the answer) is a reasonable if not a low rent for the property, and it is not proved that any representation made by the complainant in reference to the rent was untrue.

It is very significant, as to all these alleged misrepresentations, that the defendant did not, when called upon to perform the contract, present them as an excuse for his refusal rather than queries in regard to the title of the property. It is evident that his hope of escape from the obligation of the agreement was through objection to the title of the property, if any could be made, rather than through the defence of

Shaddle *v.* Disborough.

alleged misrepresentations. He says that when he left his house to go to Van Doren's office, on the day fixed for the exchange of the papers, he was undecided what to do, but before he got to Main street, he determined to show the abstract of title, which the complainant had lent to him several days before that time, to his lawyer, thinking, he says, that there might be some flaw in the title, and he might get out of it in that way. He further says that after giving the abstract to his lawyer for examination, he went to Van Doren's office and there found the complainant and his wife, the complainant's lawyer and (he thinks) Van Doren; that they asked him if he was ready, and he said no, that his lawyer was looking over the abstract of title; that he stayed there but a few minutes and went back to his lawyer's office; that he thinks he saw them again that day, but does not recollect anything in particular which occurred at the second interview; that they asked him how near he was to being ready, and he replied that his lawyer was examining the abstract. It is surprising that, if he then was aware, as he says he was, of the falsity of the alleged representations on which his defence is almost entirely based, he should not at least have mentioned some of them as an excuse rather than to have relied on objections to a title against which he neither knew nor had reason to suspect anything. Van Doren testifies that on that occasion, when the complainant asked the defendant if he refused to comply with the agreement because of the alterations, he replied, " No, I don't, but there are other things I don't like in the title," or " about the title." He says he did not say a word about having been deceived. Again, in the interview between his counsel and the complainant on that day, these alleged misrepresentations do not appear to have been mentioned.

The answer alleges that Van Doren, who it states was the broker for both parties, on or about the 12th of June (the day on which the agreement was signed) represented to the defendant that the complainant was then painting and making repairs on the Jersey City house, as the complain-

ant had informed him, to the amount of from $200 to $225, and would so put the property in complete repair; whereas the defendant alleges that no repairs of consequence have been made.

It appears that the agreement was first signed by the defendant; that on the morning when it was drawn, Van Doren told the defendant that the complainant had ordered Mr. Isbills to put the house in thorough repair, and that it might cost $100 or $150, and he adds that he thinks he said Isbills was ordered to paint it. Though the statement does not appear to have been made as an inducement to the defendant to enter into the agreement, the complainant made the repairs and caused the painting to be done.

There is nothing in the case to sustain the allegation of misrepresentation in regard to the water tax.

But the answer insists that specific performance ought not to be decreed because the bargain sought to be enforced was hard and unconscionable. Inasmuch as no fraud is shown to exist in the case, this defence must rest on inadequacy of price alone. But unless the inadequacy is such as to shock the conscience of this court and in itself to amount to conclusive and decisive evidence of fraud in the transaction, a defence to such an action as this, based on that alone, will not avail. *Coles* v. *Trecothick,* 9 *Ves.* 234, 236; *Garrett* v. *Macon,* 2 *Brock.* 185, 246; *Fry on Spec. Perf.* § 281; *Rodman* v. *Zilley, Sax.* 321.

The proof, however, does not show inadequacy of price. Nine witnesses, all living in Jersey City and having knowledge of the value of property there, testify that the property is now worth between $4,000 and $5,000. It is true, there are ten witnesses produced on the other side who put a much lower valuation on it. Five of them, however, are persons who reside and do business in Rahway. It is hardly necessary to say that their opinions on the subject of the value of property in Jersey City, are, therefore, inferior in weight to those of persons residing in Jersey City and having knowledge of the real estate market there. One of those

five witnesses is Nicholas Mooney, who appears to have taken an active interest in the suit in behalf of the defendant, and to have got the other four to go to Jersey City to examine the property with a view to testifying in this action, as to its value, on behalf of the defendant.

There will be a decree for specific performance.