## Case No. 9,235.

MASON et al. v. CROSBY et al.

[2 Ware (Dav. 303) 306.] [1]

Circuit Court, D. Maine. Oct. Term, 1846.

PRINCIPAL AND AGENT — PRE-EMPTION OF LAND TO MAKE SALE—EQUITY—STALE CLAIM— PECUNIARY EMBARRASSMENTS.

1. A contract, by which a right of pre-emption is given to a party for a certain time at a fixed price, on a bona fide expectation that he may become a purchaser, will not constitute him an agent of the vendor, although he sells his interest in the contract at an advanced price before the expiration of the term.

2. But if the right of pre-emption is given not with an expectation that the party will become

---

[1] [Reported by Edward H. Daveis, Esq.]

a purchaser, but solely for the purpose of enabling him to make sale of the thing, and to get his compensation in the advanced price, this will render him the agent of the owner, and the consequences of agency will follow so as to render the owner responsible for his acts.

3. Generally, poverty is no excuse to a suitor, for delay in commencing a suit. But, when the statute of limitations does not create a bar to the legal remedy, the pecuniary embarrassments of a plaintiff will so far excuse delay, not beyond the period of legal limitation, as to relieve his claim from the imputation of staleness; especially when his embarrassments have been occasioned by the acts of the defendant.

This was a bill in equity, brought to rescind a contract for the sale of 6,000 acres of timber land lying in the county of Washington, on the waters of the Schoodiac, on the ground of fraud or mutual mistake. The land was originally purchased of the commonwealth of Massachusetts, by Munroe, who took of the commonwealth a bond for a deed. He assigned his bond to one Stephen Smith. Smith reassigned the bond and the equitable title to the land to the defendants, at the price of two dollars and a quarter an acre, and they, having paid the balance due to the commonwealth, took a deed to themselves. The legal title was conveyed to the defendants, Crosby and D. Brastow, but five other persons, viz.: Boynton, Wilson, Thurston, B. Brastow, and Porter were interested in the purchase, in different proportions, to the amount of two-thirds of the whole, so that these defendants owned but one-sixth each of the land, and held the other two-thirds in trust for the other purchasers. All the parties being desirous of selling, it was agreed between them to offer the land for sale at the rate of six dollars an acre, or $48,000 for the whole. Thereupon a bond was given by Boynton and Porter, two of the equitable owners, to Nathaniel Fifield, giving him a right of pre-emption of the land at that price, for a limited time. With this bond Fifield went to Massachusetts and agreed to sell the land to the plaintiffs for eight dollars an acre, the difference of two dollars being his own profit. When Smith transferred the bond of the commonwealth of Massachusetts to the defendants he delivered to Boynton two certificates, one of Samuel Sawyer and one of Joseph Sawyer, one of them stating that he had recently explored, and the other that he had worked on the land in getting off timber in 1832, and both certifying that there was then standing on the land 6,000 feet of pine timber to the acre on an average, and from 4,500 to 5,000 feet of spruce; and also, another certificate, signed by five persons of St. Stephens, certifying to the good character of the Sawyers. It was principally on the reliance placed by the plaintiffs upon these certificates, with the strong assurances of Fifield and some of the owners of the land, that they might be entirely depended on, that the purchase was made. Mason, it is true, went from Boston for the purpose of going upon the land and exploring it himself, but by the

artifices of Fifield he was prevented from going to it, or, if he actually went on any part of the land, from exploring it. Before the sale of the land by Smith to the defendants, he agreed with one Samuel Darling, Jr., to give him one quarter of the profit he would make on the sale in consideration of Darling's assisting him in making the sale. For this purpose, Darling procured these certificates of the Sawyers, writing them himself, and they signing them. And he was one of the five persons who afterwards signed a certificate that the Sawyers were honest men, and that perfect reliance might be placed on their certificate. These certificates were proved to be grossly false, there not being one-tenth of the amount of timber on the land that was stated in them. Nearly the whole had been taken off in the years 1831–2 and 3. There was no evidence that Boynton and the other purchasers knew the manner in which the certificates had been obtained, or that they were false. Other representations were made, with regard to the expense and facilities of getting the lumber to a market, which were proved to be untrue. The plaintiffs charged in the bill that Fifield acted as the agent of the owners. The defendants denied, in their answers, the agency of Fifield and all knowledge of fraud or falsehood in the certificates; and stated that they had no personal knowledge of the land, and had purchased it on the credit of written reports exhibited to them. Part of the purchase-money was paid when the the deeds were executed, and notes were given for the residue with a mortgage of the land. The defendants have since entered on the land for the non-payment of the notes, and foreclosed the mortgage, and thus regained a complete title to the land. The bill prayed that the defendants may be required to repay the money they have received, and deliver up the outstanding notes, and be perpetually enjoined from suing them at law. These are briefly the material facts.

Mr. Bishop and S. Fessenden, for plaintiffs.

W. P. Fessenden and Mr. Kent, for defendants.

WARE, District Judge. The first question, that arises in this case, is whether there was such a fraud in the making of this contract, as will furnish a just ground, on the principles upon which courts of equity are accustomed to deal with such cases, for rescinding the contract, and replacing the parties, as nearly as may be, in the same situation as they would have been if the contract had not been made. Upon this question, it appears to me that there is no reasonable ground for hesitation. It is clear that the plaintiffs, in making the purchase, relied mainly on the certificates of the two Sawyers, supported by the strong representations of Fifield and some of the owners, that full confidence might be placed in them. The plaintiffs did indeed at first decline to consummate the bargain without examining and

exploring the land themselves, and Mason went for the purpose of making the examination, in company with Fifield, and Fifield set out with him for that purpose. But before arriving at the land, Fifield was, or pretended to be taken sick, and after remaining near the land for two or three days, he informed Mason that his bond would expire in a short time, and that he should lose the opportunity of selling and they of buying, unless he immediately returned to Bangor; and they accordingly returned, without any examination of the land, and completed the bargain. So that the plaintiffs purchased entirely upon their reliance upon the representations made to them by Fifield, corroborated by that of some of the owners, that entire confidence might be placed on the certificates of the Sawyers, who were men of good character. Now it is proved to a demonstration, that these certificates were grossly false. In the years 1831–2 and 3, one William Todd had a general license from Munroe, who was then the owner, to cut timber from the land, paying for his license the gross sum of $1,500 for the three years. During those years, nearly the whole of the valuable lumber was taken off. So that when the plaintiff purchased, according to the testimony in the case, instead of there being 6,000 feet of pine lumber to the acre, there was not more than half a thousand, or about one-twelfth of the amount which the certificate stated.

The manner in which these certificates were obtained throws some light on their character. In the spring of 1835, Smith engaged one Samuel Darling, Jr., to aid him in disposing of the land, and promised him, for his services, one quarter of the profit he should make in the sale. Thereupon Darling obtained these certificates of the Sawyers, writing the certificates himself, and signing another paper to go with them, certifying to the good character of the men. It is immaterial whether Darling and the Sawyers did or did not know they were false. They would be equally fraudulent in one case as in the other. That the object in obtaining them, was to delude and defraud purchasers, cannot be doubted. These certificates were delivered by Smith to Boynton, one of the purchasers, and by them put into the hands of Fifield.

There is no evidence that the present defendants, or those interested with them in the purchase, had any knowledge of the manner in which these certificates were obtained, or that they were so grossly inflamed and false. But it is fully proved that they received them, that they were put into the hands of Fifield, and that he made use of them to induce the plaintiffs to purchase; that Fifield and some of the parties in interest gave the strongest assurances that they might be depended upon. Fifield said that there was a larger amount of lumber on the land than the certificate stated, and that he would guarantee 10,000 feet to the acre. It is said by Lord Eldon to be an old rule of equity, that, if a representation is made to a man going to deal on the faith of it, in a matter of interest, he that makes the representation shall guarantee its truth. Evans v. Bicknell, 6 Ves. 183. And it makes no difference, in law or morals, whether he knew or did not know it to be false. Ainslie v. Medlycott, 9 Ves. 21; 1 Story, Eq. Jur. § 193. It is equally a fraud to aver a fact to exist, the reality of which the party is ignorant of, as it is if it is known to be false. There is no doubt that the representation was made that the certificates were entitled to full confidence, and that there was even more timber than they stated. Nor is there any more doubt that Fifield knew that the plaintiffs relied mainly, if not wholly, on these representations, in making the bargain. Whether he knew them to be fraudulent and false, or not, is not material in this case. He made himself responsible for their fairness and substantial correctness. But I think it may be fairly inferred, that if Fifield did not know that the certificates were false and procured for the purpose of fraud, that he had reason to suspect, and did, in fact, suspect it. If this suit were against Fifield, therefore, no hesitation could be felt in coming to the conclusion that the contract ought to be rescinded, as being deeply tainted with fraud.

This brings us to one of the important questions in the case, whether Fifield, in making the contract, acted as the agent of the defendants, so as to render them responsible for his acts. This is charged in the bill, and is fully denied in the answers. It becomes, then, necessary to consider the terms of the contract entered into with Fifield. The instrument itself is not produced, but it is proved, by the evidence, and admitted to have been a bond, giving him a right of pre-emption of the land for a limited time. Fifield was not, therefore, an avowed agent, nor did he assume to act as such. If he was made an agent, it was rather as a legal result from the facts, than from the avowed intention of the parties, for it is not pretended that the owners, by this bond, intended formally to make him an agent. But an agency may be implied from the circumstances and mode of dealing, and forced by law on the parties, which will, when the rights of third persons have become involved, be equally binding as if it were created by the most formal instrument.

It is certainly true, that an agreement, giving a party a right of pre-emption of a thing, for a fixed price and a limited time, will not per se constitute him an agent of the vendor. Even if the party sells his bond or his interest in the contract before the expiration of the time, this will not render him an agent. Such engagements are of frequent occurrence in commercial transactions, and it was never imagined that they constituted the party, having such a bond or contract, an agent of the owner, so that he became responsible, as principal, for the contracts

which the party made with others. If such a right of pre-emption is given to one, with the bona fide expectation that he may become a purchaser solely, or in company with others whom he may induce to join him in the purchase, this can in no sense make him an agent of the vendor, nor will it render the vendor responsible for any fraud, or misrepresentation, which the party having this right of pre-emption may make in a resale of the thing. The owner has nothing in contemplation but the sale of the thing to the person with whom he has made the engagement. On no principle of law or public policy can he be held, as a principal, for the misconduct of his vendee, in a subsequent sale of the thing to a stranger. Whatever passes between them, is res inter alios acta. If he makes false and fraudulent representations to his vendee, and these are communicated to the second purchaser, who relies upon them, he may in some cases become directly liable to the second purchaser for his fraud. Langridge v. Levy, 2 Mees. & W. 532; on error, 4 Mees. & W. 337; Pilmore v. Hood, 5 Bing. N. C. 97; Crocker v. Lewis [Case No. 3,399]. But this liability does not result, properly, from the principles of the law of agency.

On the contrary, if the vendor gives this right of pre-emption to a party, not with the expectation or understanding that he is to become a purchaser, either solely on his own account or in company with others, but merely to enable him to make sale of the thing to strangers, leaving him to get his commissions or compensation in an advanced price, then, I hold, he becomes in law the vendor's agent, whatever color may be given to the contract. In the interpretation of contracts, the law looks to the substance and effect of the contract, and will not be blinded by the disguise which the parties may throw over the essential characters of the engagement. Such an engagement has all the effects of an agency, and, according to the intention of the parties, it has no other. It is true that the party who has this preemptive right may, if he chooses, become a purchaser himself. But this forms no part of the original intention. The sole object is to clothe him with the power to sell, and he may sell under it just as well as he can under the most formal agency. The law will not and ought not to allow a man, under such a disguise, to reap all the advantages of an agency, and escape from all its liabilities. If this can be done, it is easy to see how he may practice frauds to any extent through a simulated vendee on the unsuspecting and unwary, may securely pocket the fruits, and leave the victims of the fraud to seek their remedy from an irresponsible man of straw.

To which of these categories does the engagement with Fifield belong? Was this right of pre-emption given with any expectation that he would become a purchaser, or was it merely to enable him to effect a sale of the land for the benefit of the owners? On the whole evidence there can be no doubt, I think, that it belongs to the latter. This appears in various parts of the record, but perhaps as clearly as anywhere in a letter of Brastow, one of the defendants, to Mrs. Leland, the wife of one of the plaintiffs, under the date of April 5, 1837. In speaking of the sale of the land, he says, "We told two of our company that they had better put the land into the market at six dollars an acre. Wm. F. Boynton" (the son-in-law of Brastow) "and Joseph Porter, according to the usual custom, gave a bond of said land to Nathaniel Fifield." There is not an intimation in this letter, nor in any part of the record, that Fifield was expected to become a purchaser. The bond was given to him to put the land into the market; that is, to enable him to make a sale of it. Can there be any doubt that the sole object of the owners was to enable Fifield to sell the land for their benefit? I think not. My opinion therefore is, that Fifield was substantially made an agent, and that the legal consequences of an agency must follow.

Brastow, in his letter, says: "We told two of our company they had better put the land into the market, and in pursuance of this advice the bond was given to Fifield." Who are included under this plural designation we, does not appear; and it cannot, therefore, be determined who concurred beforehand in this arrangement with Fifield. It is certain that Brastow did, and there can be no difficulty in holding him responsible. But Crosby, in his answer, denies that he took any part in it, and there is no evidence tending to show that he did, or that he knew of its existence until some time after it was completed. He admits, however, that he consented to sell his interest in the land at six dollars an acre. And when the pre-emption contract became known to him, he did not dissent but acquiesced; and, after the sale was made by Fifield, finally ratified it without any inquiry into the circumstances or authority under which the contract with Fifield was made, or the proceedings of Fifield in making the sale. Brastow and the other owners derived no authority to sell the interest of Crosby, from the naked fact that they were jointly interested in the land. Yet when they had all determined to sell for a fixed price, an authority to act for all, in making the preliminary arrangements, might be more easily inferred than it would be under other circumstances. It is a fair and reasonable deduction from the whole evidence, that Crosby passively acquiesced and allowed the acts of Brastow and the other owners, and this silent acquiescence, all the parties living in the same neighborhood, and the subsequent ratification of the sale, under the circumstances, will, in law, be equivalent to a prior mandate. A court of equity would be going a great way in covering up wrong

to allow a part owner to lie by silently and permit his co-owner to practice a fraud in the sale of the joint property, and to take with impunity the fruits of the fraud, merely because he was not actively engaged in perpetrating it. My opinion on the whole case is, that though Crosby had no active participation in constituting Fifield an agent to sell, nor in any of the representations that led to the sale, he must be held as a principal, for the acts of Fifield, at least so far as he has been enriched by the fraud at the expense of the plaintiffs. "Jure naturae aequum est, neminem cum alterius detrimento et injuria fieri locupletiorem." Dig. 17, 50, 206.

This brings us to the last question in the cause, and which was strongly contested at the argument. If the right to rescind the contract ever existed, has it been lost by lapse of time? I have found more difficulty in coming to a conclusion satisfactory to my own mind on this point, than in any other part of the case.

In cases of fraud, time begins to run against the remedy only from the discovery of the fraud. Brooksbank v. Smith, 2 Younge & C. Exch. 58; Blennerhassett v. Day, 2 Ball & B. 129. The contract was, in this case, made in August, 1835, but the deception which had been practiced on the plaintiffs, was not in fact discovered until the fall of 1836. Suspicions had indeed before arisen in their minds, that the representations which had been made to them were highly exaggerated and untrue, but the real state of the facts was not known to them till something more than a year after the contract was made. The bill was filed in August, 1841, so that even the six years' limitation at law had not expired when the suit was commenced. If, then, the plaintiffs are barred, by lapse of time, of equitable relief, it is not by the statute of limitations operating, by analogy, in equity, as it does directly at law. If relief is denied on this ground, it will not be by the application of the legal prescription, but on the mere general ground, that the plaintiffs have slept on their rights for such a length of time that the claim has become stale and antiquated. The ancient brocard, "vigilantibus non dormientibus subvenit lex," is applied in equity, in some cases, with more stringency than at law, and therefore equity will sometimes, under peculiar circumstances, hold a party barred of equitable relief when he is not of his legal right. Then it simply withholds its hand and leaves a party to his remedy at law.

It would have been more satisfactory if legal proceedings had been instituted, in this case, at an earlier period, and while the matter was fresh. But the delay is in part accounted for. In the first place, negotiations were undertaken to effect a compromise. They failed, but some time was consumed in this way. And in the second place, the plaintiffs had been ruined and stripped of their whole property by the fraud, and were desti-

tute of the pecuniary means of prosecuting their rights at law. It is said by Lord Redesdale, that the court cannot take into consideration, as an excuse for delay, the pecuniary embarrassments of suitors, for if this were done, there would be an end of all limitations of actions for distressed parties. Hovenden v. Lord Annesley, 2 Schoales & L. 639. But this was said in a case where the plaintiffs had slept on their rights sixty years, and in which the court held, on a full consideration of the subject that every equitable right must be prosecuted within twenty years, or it would be barred by the statute of limitations operating by analogy on equitable rights, as it does directly at law. But when the delay has been so great as to create a statute bar at law, it is not so clear that the pecuniary embarrassments of a suitor may not excuse some delay, so far as to relieve the plaintiff's claim from the imputation of staleness, especially when his embarrassments have been occasioned by the acts of the defendant. On the contrary, it appears to me entitled to consideration. For when a defendant relies for his protection, in equity, on lapse of time, independent of the statute bar, he addresses himself peculiarly to the conscience and discretion of the court. This is not an exemption which he can claim of strict right; but he puts his defense either on the particular equities of his own case, or on the general policy of discouraging the litigation of stale and antiquated demands. Now when the plaintiff pleads, as an excuse for delay, his inability to meet the necessary expenses of prosecuting his rights, and this inability is occasioned by the very fraud for which he seeks redress, this plea certainly goes far towards overcoming the defendant's objections, whether addressed to the conscience or prudence of the court. Such is the case with the present plaintiffs, and my opinion is, that they have not come into equity too late to be heard, though they may not be entitled to all the relief they might have had if they had come earlier.

The legal title to the land was in the defendants, and the deed was executed by them. But by an agreement between the parties concerned in the speculation, these two defendants were to have but one-sixth each of the interest in the purchase of Smith. Two-thirds was in several other persons, and this was known soon after, if not at the time when the bargain was completed. The money which was paid was distributed among the parties in proportion to the interest they had under this agreement. These persons should properly have been made parties, and if not known when the original bill was filed, should have been brought into the case by a supplemental bill. As this has not been done, the decree cannot affect their rights. Still, as Crosby and Brastow held the whole legal title, and were ostensibly the sole contracting parties, they might, perhaps, if the suit had been commenced as soon as the fraud was

discovered, have been held for the whole and left to seek contributions among the other parties in interest. But since that time some of them have become insolvent, and it is not equally in the power of the defendants now to recall the money, as it would have been had the suit been promptly commenced. The delay has occasioned this inconvenience to them, that if they are now held to refund the whole of that part of the purchase-money received, the decree will operate, as to them, not simply to put them back in the same situation as they would have been in, if no contract had been.made, but they will sustain an actual loss. It would be throwing on them a loss occasioned by the act, that is, the delay of the plaintiffs. If the defendants had been actively engaged in concocting the fraud, they might have been held responsible in solido, and left to bear the loss arising from the insolvency of the other parties. But there is no ground for imputing to them fraud, personally, certainly not to Crosby. They had not, and did not pretend to have, any personal knowledge of the land, but bought on the representations of others. It appears to me, therefore, that it would be inequitable to visit upon them the consequences of this delay of the plaintiffs. And a court of equity has authority not only to prescribe the terms on which it will grant relief, but to mold and temper its relief so as to meet all the equities of the case. My opinion, on the whole, is, that the sale should be declared void, as to so much of the land as, by the agreement of the vendors, belonged to Crosby and Brastow: that the outstanding notes in the hands of the defendants be ordered to be given up and cancelled; and that each of the defendants be decreed severally to restore to the plaintiffs so much of the purchase-money as they each severally received to their own use, and that it be referred to a master to examine and report the amount so received and to be repaid, and that the plaintiffs be required to release to the defendants such undivided portion of the land as equitably belonged to them according to the agreement aforesaid, and that all further action be reserved to the coming in of the master's report.

[Circuit Justice Woodbury delivered an opinion to the same effect in this case. See Case No. 9,234. Subsequently the master filed his report, which was excepted to. The exceptions were heard and overruled in Case No. 9,236.]