## ALGER v. ANDERSON et al.

### (Circuit Court, M. D. Tennessee. February 11, 1897.)

**1. TITLE OF EXECUTOR—PARTIES TO ACTION.**

Where an executor is empowered by the will to sell lands, and make and acknowledge titles to lands sold, he takes the fee-simple title; and, in an action against him in that character to rescind a contract made by the testator for the sale of land, he properly represents all of the beneficiaries. But if, upon a decree obtained against the executor, the lands embraced in the contract rescinded should fail to satisfy any recovery in favor of the plaintiff, the heir in any proceeding thereafter to subject real estate descended may make any defense to the action which the executor could have made in the first instance.

**2. PARTIES TO ACTIONS — FAILURE TO BRING ALL PARTIES INTERESTED BEFORE THE COURT.**

When the bill suggests as a reason for not bringing all parties interested before the court that some of them are not known to the plaintiff, the case may proceed without the unknown parties, in the absence of any statement of fact in the answer showing the excuse suggested in the bill to be untrue.

**3. NOTICE OF FRAUD—LACHES.**

In a suit for relief from a secret fraud, the defense of laches cannot prevail where the suit was commenced within a reasonable time after the evidence of fraud was discovered; and the complainant in such a suit was not required to take notice of facts brought out in a suit to which he was not a party, and which presented no issue affecting him directly or indirectly.

**4. PRINCIPAL AND AGENT—FRAUD OF AGENT IN SALE OF LAND.**

The law looks at the substance of a transaction, and not its form. And where real-estate agents with whom land was listed for sale procured the owner to give them an option and title bond, in order to make certain that the sale, if made, would be allowed to go through without obstruction, they did not become purchasers, and cease to be agents, and the principal is liable for their fraud.

**5. SAME—BRIBERY OF AGENT.**

Where an agent has been bribed or tempted to betray his principal, that fact is sufficient to entitle the principal to repudiate the transaction; and it is not necessary, as a basis for relief for the principal, to show the actual effect of the bribe or gift upon the agent.

**6. SAME—ACCEPTANCE OF PROFITS OF TRANSACTION AFTER FRAUD OF AGENT IS DISCOVERED.**

Where one of two joint owners of land listed it with real-estate agents for sale, the other owner having consented thereto, and received a part of the consideration, and never having repudiated the sale made by the agents after discovering the fact that they had been guilty of fraud, he is estopped to say that he is not connected with the fraud; but, in view of his relation to the transaction, he is not liable beyond the benefit actually received.

**7. SAME—RESCISSION.**

The fact that the purchaser has taken a small amount of timber from the land does not constitute such a change in the condition of the premises as to preclude him from having a rescission on account of the secret fraud of the vendor's agent.

Granbery & Marks and Estill & Lynch, for plaintiff.

W. H. Brannan, W. J. Clift, A. S. Colyar, Banks & Embrey, and Vertrees & Vertrees, for defendants.

CLARK, District Judge.    The bill is filed for the purpose of rescinding and setting aside as fraudulent a deed and sale of land made by John F. Anderson, of Franklin county, Tenn., ancestor of the defendants, to R. A. Alger, of Detroit, Mich.    The deed was executed March 4, 1889, conveying 14,804 acres of land, in considera-

tion of $103,628, being at the rate of seven dollars per acre, as the proof fully shows the sale was. The bill was filed August 28, 1894. In the latter part of 1888 this body of land was listed for sale by John F. Anderson, deceased, with a real-estate firm in the city of Chattanooga, Tenn.,—Sheridan, Green & Co.,—whose business was that of selling land on commission for others, and it was no part of their business to buy and sell land on their own account. After some modifications of the terms under which the real-estate agents were to handle the land, it was finally agreed that they might have such profits as could be made over and above four dollars per acre, that being the amount to be paid to Anderson for the land. The real-estate agents at once sent abroad printed circulars, descriptive of the lands, in which they were represented as possessing great value on account of the timber and mineral interests, such as coal. These circulars attracted attention, among others from Alger, and the negotiations which resulted finally in the sale and conveyance in question thus had their origin. During the progress of the negotiations, Sheridan, Green & Co. became impressed with the belief that they would be able to effect a sale with complainant, Alger; and, for some reason or other, they became apprehensive that Anderson might finally refuse to convey, or embarrass them towards the close in the effort to make the sale. This was probably due to the fact that the price put upon the lands to Alger was seven dollars per acre, and it was thought that so large a profit, if it became known, would create dissatisfaction on Anderson's part. So, under the advice of counsel, in order to guard against such contingency as this, the real-estate firm procured Anderson to give an option and title bond, and paid him down a small sum, in order to make certain that the sale, if made, would be allowed to go through without obstruction by Anderson. The real-estate firm had no means with which to have purchased the land on their own account, and did not contemplate doing so, and it is certain that Anderson did not so understand the effect of what was done. The part which Anderson took in regard to the sale was just the same after as before the execution of the title bond. The deed was, in the end, executed by him directly to Alger, and the money paid by Alger directly to him.

Included in the lands sold and conveyed by Anderson was a tract containing about 4,800 acres, jointly owned by him and his grandson, the defendant Gonce; Gonce being the owner of a three-fourths, and Anderson a one-fourth, undivided interest therein. It is insisted that Anderson was merely the equitable owner of this one-fourth interest, and not the legal owner, and that the relation of tenants in common between Gonce and Anderson did not for that reason exist in law. This view cannot, in my opinion, be successfully maintained. The fact that Anderson had listed the property with the real-estate firm before mentioned, for sale, became known to Gonce, who agreed that the land might be sold, but he desired for some reason to give the transaction the form of a sale by him to his grandfather, Anderson, instead of direct to the complainant, Alger. The body of land had been purchased by Gonce at a judi-

cial sale in the state court, and he finally gave the clerk of the court, who was empowered to make a deed, a direction to make the deed direct to complainant, Alger, instead of Gonce; but the agreement between him and his grandfather, as it is insisted, was for a quit-claim, and the direction by which the deed was made direct to Alger by the clerk was in a quitclaim, and to Anderson; and Gonce received therefor from Alger the sum of $15,572, the deed to Anderson having been placed in the bank in escrow, to be delivered only when this sum was paid by Alger to the bank for his (Gonce's) account. For the purpose of determining whether the lands were as represented by Sheridan, Green & Co., complainant, Alger, sent one A. J. Freer, called a "land looker," to Tennessee, for the purpose of investigating the lands, and making a report to him. This man had been engaged for similar purposes, and had in that sense been the trusted agent of complainant for many years. About the same time, another gentleman from Detroit, well acquainted with complainant, Alger, by the name of Lynn, appeared upon the ground, as he says, as a result of having seen this circular of Sheridan, Green & Co.; and he in some way became interested in the sale of the land with Sheridan, Green & Co. Freer went upon the lands, and made the usual examination, being attended by a representative of the firm of Sheridan, Green & Co., made measurements of the coal veins, examined as to timber, the location and quality of the land, and all other facts which would go to settle the question of whether the purchase would be desirable and profitable to complainant, Alger. During the time of such examination, various letters were written in regard to these matters. After his examination of the land, and on his way back to Detroit, he came to the city of Chattanooga, but did not call upon the firm of Sheridan, Green & Co., and this was regarded by members of the firm as an unfavorable indication. Thereupon a member of that firm called to see Freer at the hotel, but obtained no satisfactory statement from him as to what report he would make on reaching complainant, Alger. Just as he was boarding the train for Detroit, he stated, however, to this representative of the real-estate firm, that the firm would hear from him through Mr. Lynn. Accordingly, Mr. Lynn was interviewed at the first opportunity, and made known to the firm the importance of sending a telegram to the Griffin House, in Detroit, in order that it might reach Freer in due time; and this telegram was accordingly sent. Thereafter Freer called upon complainant, Alger, and made his report in regard to the land, using for that purpose a memorandum book in which were contained some of the facts of his examination. Complainant, Alger, says that the verbal report thus made was more favorable in some respects than such report as was made by letter from time to time written from Tennessee. Thereupon complainant, Alger, sent a coal expert by the name of Shipman to Tennessee, for the purpose of making a more particular examination in regard to the coal, although Freer had made measurements and reports in regard to the size of the coal veins, the number, etc. Freer returned with Shipman, and attended him during his examination. The proof develops many

curious facts relating to Shipman's trip and examination of the coal entries, which it is not now deemed necessary to set out in detail. It is sufficient to say that Shipman made his report. Freer went to the real-estate firm, and demanded of the firm a distinct obligation to pay him one-third of the profits which that firm was to make on the sale, accompanied with the threat that, unless this was done, he would send a telegram which would break up the sale. It is reasonable to suppose that this one-third of the profits was the indispensable condition about which the telegram was sent to Freer, though this fact is a matter of inference. Without further detail, Freer's demand was agreed to, and the trade was closed, and Freer receipted for and was paid by the firm March 16, 1889, in the city of Chattanooga, and a receipt given therefor, which reads as follows:

"Chattanooga, Tenn., March 16th, 1889.

"Settlement with A. J. Freer between the said Freer and Sheridan, Green & Co. for his, the said Freer's, interest in the profits of the sale of land, formerly owned by John F. Anderson, and sold by Sheridan, Green & Co., through his, the said Freer's, recommendation, to Gen. Russell A. Alger, of Detroit, Michigan, in full of all accounts due from the said Sheridan, Green & Co. to the said A. J. Freer, as his interest in the profits of the sale.                    A. J. Freer."

In point of fact, by the verbal direction of Freer, $1,620 of this sum was paid to Edward J. Lynn, the other friend and neighbor of complainant, Alger. It is probably just to say that Sheridan was personally sincerely opposed to the arrangement made with Freer, and only consented finally under pressure of the fact that otherwise the labor and expected profits on the large sale would be lost. Just how many or how few, in presence of such a condition, would have sufficiently weighed the deeper consequences, is a question which admits of only a speculative answer. The full amount of the purchase price has been paid. Rescission of the contract is sought in the bill, and in argument, upon three distinct grounds: First. Upon the ground that the coal entries had, by the real-estate firm, with the assistance of Anderson, been so manipulated as to produce a false appearance, and thereby to mislead both Freer and Shipman into the belief that the coal veins were more than twice as large and valuable as was the fact. This was done by what is called "blowing up," "facing," etc. Second. Another ground on which the case proceeds is that Anderson included in the deed of conveyance and represented the title as being good to more than 5,000 acres of land, well knowing at the time that he had no title whatever to this quantity of land, making a deficiency of more than one-third of the total. Third. Relief is asked upon the ground that the real-estate firm bribed and corrupted A. J. Freer, the agent of R. A. Alger, and influenced him thereby to make a favorable report, and to bring about a sale of the land, and that he betrayed his principal in the matter. The proof is very voluminous, and the record now unusually large. So far as the bill is based on fraud by including lands to which the vendor knew he had no title, and also so far as there are alleged misrepresentations and fraud in the false appearance which the coal entries were made to present, the relief is resisted with great ability and force, upon the ground that the complainant was put upon inquiry in respect to these matters, and that the lapse

of time is a bar to any relief. It is argued also that, in regard to the bribery of Freer, the complainant could have ascertained this fact by reasonable inquiry, and that, not having done so, relief should be denied on that account also. It is made very plain by the proof that the complainant had no knowledge or intimation that his agent had received money from those adversely interested to complainant until about April, 1894, and that prompt inquiry was then made into the truth of the matter, and, as soon as this was ascertained, the bill was filed.

In the determination of the case, I have concluded to first examine the alleged corruption of Freer as a ground of relief, for if that issue is decided in favor of the plaintiff, and against the defendants, it would render it unnecessary for the court, for the purpose of disposing of the case, to decide upon the sufficiency of the other grounds alleged as a basis for the relief asked. The defendants make what is called a "preliminary objection" to the whole bill, upon the ground that the bill shows that only a part of the heirs of John F. Anderson, deceased, are brought before the court. The bill alleges generally that they are very numerous, and many of them unknown to the complainant, although it is not alleged that any of them reside out of the jurisdiction of the court. The executrix of the last will and testament of Anderson is made a party defendant in that capacity, as well as in her capacity as an heir at law, with others. In the answer filed, a number of the heirs at law joined, not named as defendants to the bill, as they had a right to do under a bill like this, filed against them as a class, by making actual parties some of the representatives of the class. The executrix is charged with certain trust duties under the bill, in addition to the duties which belong to her as executrix only; and I think it is quite clear that if the contract in this case is rescinded, and the property goes back to the estate of John F. Anderson, it would be controlled by the eighteenth clause of the will. The testator, after having devised to different ones of his relatives, children, and grandchildren various parcels of land, gives general direction, under clause 18, to sell the remainder of his land. That clause concludes with this direction:

"I desire it sold with the other lands. I also wish all the lots and lands lying about Anderson Station, in Franklin county, not disposed of, and such other lands as I may have at my death not bequeathed away, be also sold; and my executors are authorized and empowered to make such sales, and to make and acknowledge titles to any and all lands that they may sell, the same to be done under the advice of my said attorneys."

The general rule is everywhere admitted that an executor or other trustee takes just such title to the property as is required to fully execute the trust, and, under a provision such as that above quoted, it would be necessary for the executor to take the legal title in fee simple. Neilson v. Lagow, 12 How. 110; Webster v. Cooper, 14 How. 499; Doe v. Considine, 6 Wall. 471.

So far, therefore, as the lands embraced in this deed are concerned, it is probably true that the executrix in that character properly represents all of the beneficiaries; and if a decree is obtained against the executrix, and the lands embraced in the deed rescinded should fail to satisfy any recovery in favor of the plaintiff,

the heir, in any proceeding instituted thereafter to subject real estate descended, might make any defense to the action which the executrix could have made in the first instance. This objection, however, has given the court great difficulty. It seems, according to the practice, that where the bill suggests a reason for not bringing all parties interested before the court, and the defendant desires to make this objection by plea or answer, as may be done, the excuse suggested in the bill must be controverted by specially pleading matter which shows it to be false. 1 Daniell, Ch. Pl. & Prac. (6th Am. Ed.) *290, and note. General equity rule 48 is supposed to justify the omission of some of the heirs of Anderson, as is done in the case. Whether it does or not in precisely this kind of a case has not been decided, so far as I can ascertain; but the cases of Kerrison v. Stewart, 93 U. S. 160; Carey v. Brown, 92 U. S. 171; Railway Co. v. Newman, 77 Fed. 787; Smith v. Lee, 77 Fed. 779,—may be referred to. The answer does not set out anything showing that the statement in the bill as a ground for dispensing with other defendants than such as were brought before the court is not true in fact. The answer simply suggests that the will of John F. Anderson, deceased, points out the legatees; but this does not meet the difficulty, and does not show that the allegations in the bill that plaintiff does not know the names of all of the heirs of Anderson is untrue; and the cases seem to agree that, if some of the heirs are in fact not known to the plaintiff, the case may proceed without them, otherwise justice would be plainly defeated. I am fully satisfied that the interests of all of the heirs are being represented in this case, not only in good faith, but with the most marked attention and ability. In this condition of things, although the point is not quite clear, I feel that I should hold that the charges in the bill, not shown by any statement of fact to be untrue by the answer, and really fairly sustained by the proof, are sufficiently made out to justify the court in its discretion in proceeding in the absence of part of the heirs of John F. Anderson, deceased.

And I am thus brought to the merits of the case. As before intimated, the defendants do not controvert, and could not upon this record, the bribery of the agent Freer, nor do the defendants deny that the first knowledge of this which came to Alger was as hereinbefore stated. It is suggested that in a suit between the partners of Sheridan, Green & Co. in the state court, at Chattanooga, Tenn., the fact that Freer was paid a large sum of money, and how the sum was paid, was brought out, and might have been known by the complainant by the exercise of diligence. That was a case, however, to which the complainant was no party, and it presented no issue which affected him directly or indirectly. It was not a case which he was under any obligation to take notice of, and this suggestion is fully met by the case of Hodge v. Palms, 37 U. S. App. 65, 15 C. C. A. 220, and 68 Fed. 61, as well as the case of Mining Co. v. Watrous, 22 U. S. App. 12, 9 C. C. A. 415, and 61 Fed. 163. This last case was one of misrepresentation and fraud by an agent, and is in many of its facts much like the case now under consideration. This was a secret fraud, and the defense of laches cannot prevail where the suit was commenced within a reasonable time after the evidence of fraud was discovered.

It is urged on behalf of defendants that by the execution of the title bond, and taking the option as hereinbefore recited, the firm of Sheridan, Green & Co. were the direct purchasers from Anderson, and that they are the immediate vendors of complainant, Alger, and consequently that the original vendor, Anderson, was in no way responsible for the fraud of Sheridan, Green & Co. In regard to this defense I have only to say, as was said in the case of Continental Ins. Co. of New York v. Insurance Co. of Pennsylvania, 2 C. C. A. 535, 51 Fed. 890, "the law looks at the substance of the transaction, and is quite unconcerned about its form." The material facts of the relation between John F. Anderson and Sheridan, Green & Co. having been already pointed out, it is not deemed necessary to go into further details. I content myself with saying that it is very clear upon this record that Sheridan, Green & Co. were throughout the agents of Anderson, and nothing more. To hold otherwise upon the proof would be to conceal by the merest form the whole substance of the truth of the transaction. Upon this point the following cases may be referred to, without taking up space to go over the reasoning contained in the opinions: Richardson v. Hardwick, 106 U. S. 252, 1 Sup. Ct. 213; Mason v. Crosby, 16 Fed. Cas. 1016; Doggett v. Emerson, 7 Fed. Cas. 804.

The contention that Sheridan, Green & Co. were, in any proper sense, at any time purchasers, is wholly without foundation in this record. Treating Sheridan, Green & Co., then, as they must be, as the agents throughout of Anderson, it is only necessary to say briefly that it is now fully established, and no longer open to question, that the principal is bound by the fraud of his agents in making a sale, in relation to that sale,—as much so as the principal would be if acting in person; and this notwithstanding the fraud was perpetrated without the knowledge or approval, and against the consent, of the principal. This doctrine and the reasons on which it is based have been often stated. Franklin v. Ezell, 1 Sneed, 497; Barnard v. Iron Co., 85 Tenn. 139, 2 S. W. 21; Jewett v. Carter, 132 Mass. 335; Continental Ins. Co. of New York v. Insurance Co. of Pennsylvania, 2 C. C. A. 535, 51 Fed. 890; 2 Jag. Torts, 267–271; Story, Ag. §§ 134, 452; 1 Am. & Eng. Enc. Law (2d Ed.) 1158, 1159; 1 Bigelow, Fraud, 225–228; 2 Kent, Comm. marg. p. 621, and notes; Kennedy v. McKay, 43 N. J. Law, 288; Mason v. Crosby, 16 Fed. Cas. 1016; Doggett v. Emerson, 7 Fed. Cas. 804.

The doctrine, broadly stated, is rested upon the ground that the principal, having held the agent out as having authority, and having clothed him with power to act in a particular matter, as between two innocent persons, should suffer as having given occasion for the loss. This is the statement of the rule in cases where the fraud was in fact committed by the agent, without the knowledge and consent of the principal. There are cases which show an inclination on the part of some courts to hold that the innocent principal should not be liable, even when the fraud is committed for his benefit, further than to the extent of benefit received by him, because, to the extent of benefits received to the use of the principal, he thereby necessarily, and as a matter of law, adopts the

act of the agent, although fraudulent. The extent of this liability would be an obligation to return to the injured party money received to the use and benefit of the principal in case of rescission. This opinion also finds some support in the English cases. It is to be noted, too, in passing, that there is some conflict in the authorities over the question of whether an innocent principal is liable at all in an action at law for damages for the deceit or fraud of his agent; and the case of Kennedy v. McKay, 43 N. J. Law, 288, may be referred to as a case denying liability at law on such facts, but recognizing fully the right in the principal to repudiate and rescind. The current of authority, however, appears to be in favor of discarding all distinction in this respect, and holding the principal liable, at law and in equity, alike for the frauds of his agent or servant in the course of employment, provided, of course, they were committed within the scope of authority of the agent, and in the interest of the principal. And the case of Mining Co. v. Watrous, 22 U. S. App. 12, 9 C. C. A. 415, and 61 Fed. 163, which was the case of a sale through an agent, seems to sanction the doctrine in this broader statement, recognizing the right of the defrauded vendee to sue for damages at law, or to repudiate the contract, and demand rescission. Of course, the adoption of either remedy would be inconsistent with and exclude the other. Being concerned now with a case where rescission is demanded, I have no occasion to follow out or seriously consider the distinctions here suggested. I will say, however, in passing, that the relation of the defendant Gonce to the facts of the transaction is such that I cannot consider it equitable to treat him as liable beyond the benefit actually received, and this upon the ground that, to the extent of such benefit, it is agreed by all of the cases that he thereby adopts the act of the agent, however fraudulent. I may expressly remark, too, what is clearly implied, that, so far as holding that the principal may repudiate and rescind the contract for the fraud of the agent, the cases present no disagreement whatever.

It is to be said, in passing, that counsel for the defendants did not controvert this proposition of law, and have not done so at any stage of the case. It is further argued that, conceding that a division of the profits of the trade with Freer was ordinarily calculated to tempt him to betray his principal, nevertheless the proof in this record does not show the fact that Freer made any different report as a result of receiving this money, or that his report was not a true one, as he at the time believed. I think it would be very difficult to sustain the point here taken in view of the facts hereinbefore detailed. Complainant distinctly proves that in the verbal interview after Freer's return to Detroit, and certainly after the receipt of the message at the Griffin House, his statements in regard to the land examined were more favorable than those contained in the letters written from Tennessee while on the land. I would have no difficulty in holding upon the facts in the case, giving to those facts a natural interpretation, that Freer was influenced, and the extent of such influence becomes immaterial. How far a fact of this kind may have influenced the agent is in its na-

ture an intangible mental condition very largely, and could only be rationally judged of by what follows. It would probably never be within the power of the principal complaining of the transaction to affirmatively show what was the secret operation of such an influence on the mind of a treacherous representative. It is well settled, consequently, that the fact of the agent having been bribed or tempted to betray his principal, is sufficient to entitle the principal to repudiate the transaction, and it is not necessary as a basis for relief for such principal to show the actual effect of the bribe or gift upon the agent. The ground on which the rule rests is much deeper and broader than a mere question of evidence, and takes into full account human nature. The agent is not allowed, by gift, commission, or other form of compensation or consideration, to assume an attitude in conflict with the very best interests of his principal. It is a relation which, on grounds of public policy, demands the utmost loyalty to the principal at all times.

The philosophy of the law in relation to this subject was well stated by the supreme court of Minnesota in the recent case of Lum v. McEwen, 56 Minn. 278, 57 N. W. 662. The facts of the case were that one McEwen was superintendent and general manager of the business of the Northern Mill Company. The mill company had under consideration a plan for remodeling the mill, and extending its logging road to Gull river, where the mill was situated. In this juncture of affairs, McEwen agreed to use his influence and authority as superintendent of the mill company to secure the removal of its mill to Brainerd, and the plaintiff, in consideration of that influence, executed an obligation promising to pay the defendant Clark $5,000 nine months after date, on condition that within that time the mill company extended its logging railroad to Brainerd, and built a sawmill of a certain specified capacity. This note was given to Clark for the benefit of McEwen, but was given to Clark in order to conceal McEwen's connection with the matter. Suit was brought to cancel the note, and, from the judgment in favor of the plaintiff, McEwen appealed. Mitchell, J., delivering the opinion of the court, made the following observations:

"That this contract was illegal and void on grounds of public policy will not admit of a moment's doubt. Loyalty to his trust is the first duty which an agent owes to his principal. Reliance upon an agent's integrity, fidelity, and capacity is the moving consideration in the creation of all agencies; and the law condemns, as repugnant to public policy, everything which tends to destroy that reliance. The agent cannot put himself in such relations that his own personal interests become antagonistic to those of his principal. He will not be allowed to serve two masters without the intelligent consent of both. Actual injury is not the principle the law proceeds on in holding such transactions void. Fidelity in the agent is what is aimed at, and, as a means of securing it, the law will not permit him to place himself in a position in which he may be tempted by his own private interests to disregard those of his principal. In the matter of determining the policy of removing the mill and extending the road, McEwen, in the discharge of his duties, whether merely that of making recommendations, or of exercising authority to act, owed to his principal the exercise of his best judgment and ability, uninfluenced by any antagonistic personal interests of his own. His attempt to secure $5,000 to himself was calculated to bias his mind in favor of the policy upon which the payment of the money was conditioned, regardless of the interests of the mill company. It is not material that no actual injury to the

company resulted, or that the policy recommended may have been for its best interest. Courts will not inquire into these matters. It is enough to know that the agent in fact placed himself in such relations that he might be tempted by his own interests to disregard those of his principal. The transaction was nothing more or less than the acceptance by the agent of a bribe to perform his duties in the manner desired by the person who gave the bribe. Such a contract is void. This doctrine rests on such plain principles of law, as well as common business honesty, that the citation of authorities is unnecessary. The doctrine is perhaps as clearly and concisely expressed as anywhere in Harrington v. Dock Co., 3 Q. B. Div. 549. The fact that the validity of such transaction is attempted to be sustained in courts of justice does not speak well for the state of the public conscience on the subject of loyalty to trusts in business affairs."

And in full harmony with the law as thus stated is the case of City of Findlay v. Pertz, 31 U. S. App. 340, 13 C. C. A. 559, and 66 Fed. 427, decided by the United States circuit court of appeals for the Sixth circuit. In that case an officer of the city of Findlay, a municipal corporation under the laws of Ohio, was charged with the duty of making contracts for supplies for the city, and in that capacity surreptitiously stipulated for a commission for himself from the seller to the city on certain machines purchased by the agent for the city. The court held that the city might repudiate every contract thus made upon the discovery of the improper inducement operating upon its agent, and that the city might return the machines thus purchased, and resist recovery. Contracts of this character are strongly condemned in the opinion. Judge Lurton, speaking for the court, said:

"Any agreement or understanding between one principal and the agent of another, by which such agent is to receive a commission or reward if he will use his influence with his principal to induce a contract, or enter into a contract for his principal, is pernicious and corrupt, and cannot be enforced at law. This principle is founded upon the plainest principles of reason and morality, and has been sanctioned by the courts in innumerable cases. 'It has its foundation in the very constitution of our nature,' says Judge Dillon, 'for it has authoritatively been declared that a man cannot serve two masters, and is recognized and enforced wherever a well-regulated system of jurisprudence prevails.' 1 Dill. Mun. Corp. (4th Ed.) § 444. 'An agent cannot be allowed to put himself in a position in which his interest and his duty will be in conflict.' Leake, Cont. (3d Ed.) 409. The tendency of such an agreement is to corrupt the fidelity of the agent, and is a fraud upon his principal, and is not enforceable, 'even though it does not induce the agent to act corruptly.' 'It would be most mischievous to hold that a man could come into a court of law to enforce such a bargain on the ground that he was not in fact corrupted. It is quite immaterial that the employer was not damaged.' Wald's Pol. Cont. (2d Am. Ed.) 245, 246, and note a, citing Harrington v. Dock Co., 3 Q. B. Div. 549, and other cases. See, also, Taussig v. Hart, 58 N. Y. 425; United States Rolling Stock Co. v. Atlantic & G. W. R. Co., 34 Ohio St. 450, 460; Smith v. Sorby, 3 Q. B. Div. 552; Young v. Hughes, 32 N. J. Eq. 372; Yeoman v. Lasley, 40 Ohio St. 190. Such agreements are a fraud upon the principal, 'which entitles him to avoid a contract made through such agency.' Leake, Cont. (3d Ed.) 409. See, also, Panama & South Pac. Tel. Co. v. India Rubber, Gutta Percha & Tel. Works Co., 10 Ch. App. 515. 'Where there are a principal, an agent, and a third party contracting with the principal and cognizant of the agent's employment, and there are dealings between the third party and the agent which give the agent an interest against his duty, there the principal, on discovering this, has the option of rescinding the contract altogether.' Wald's Pol. Cont. (2d Am. Ed.) 246. 'And profit made by an agent in the execution of his agency must be accounted for to the principal, who may claim it as a debt for money received to his use. A gratuity given to an agent for the purpose of influencing the execution of his agency vitiates a contract subsequently made by him, as being presumptively made under that influence; and a gratuity to an

agent after the execution of the agency must be accounted for to his principal; as in the case of an agent or servant employed to make payments accepting a discount or present from the creditor.' The same author says: 'If an agent stipulates with a contractor for a commission upon the work to be done for his principal, he must account for the commission, and it is good ground for his dismissal.' Leake, Cont. (3d Ed.) 409, 410. See, also, Ice Co. v. Ansell, 39 Ch. Div. 339; Stoner v. Weiser, 24 Iowa, 434: Bell v. Bell, 3 W. Va. 183; Moore v. Mandlebaum, 8 Mich. 433. The principle which prevents an agent from contracting with himself, or from entering into any agreement which gives him an interest conflicting with his duty, applies more strongly to the officers, servants, and agents of a municipal government than to private parties. 1 Dill. Mun. Corp. (4th Ed.) § 444."

It may be remarked, too, that the rule hereinbefore announced, that the principal is bound by the fraud of the agent, is clearly implied and recognized throughout this instructive case. Such contracts are now treated as void on grounds of public policy, and are to be so regarded whenever the agent has been tempted by a gift or consideration reasonably calculated to influence his conduct unfavorably towards his principal in a matter which concerns the principal; and the law pronounces such a transaction illegal and void, regardless of the extent to which the agent may have been influenced, or regardless of whether his course of conduct was thereby changed or not. Whenever the fact that he is subjected to an improper influence of this kind is fully made to appear, it becomes a question of law, and the right of the principal thereby to repudiate the transaction is no longer open to dispute. "The rule," says Chancellor Kent, "is founded on the danger of imposition, and the presumption of the existence of fraud, inaccessible to the eye of the court. The policy of the rule is to shut the door against temptation, and which, in the cases in which such a relationship exists, is deemed to be of itself sufficient to create the disqualification. This principle, like most others, may be subject to some qualification in its application to particular cases; but, as a general rule, it appears to be well settled in the English and in our American jurisprudence." 4 Kent, Comm. (12th Ed.) marg. p. 438. See, also, cases in note.

In the early case of Michoud v. Girod, 4 How. 554, Mr. Justice Wayne stated the doctrine thus:

"The general rule stands upon one great moral obligation to refrain from placing ourselves in relations which ordinarily excite a conflict between self-interest and integrity. It restrains all agents, public and private; but the value of the prohibition is most felt, and its application is more frequent, in the private relations in which the vendor and purchaser may stand towards each other. The disability to purchase is a consequence of that relation between them which imposes on the one a duty to protect the interest of the other, from the faithful discharge of which duty his own personal interest may withdraw him. In this conflict of interest, the law wisely interposes. It acts not on the possibility that in some cases the sense of that duty may prevail over the motives of self-interest, but it provides against the probability in many cases, and the danger in all cases, that the dictates of self-interest will exercise a predominant influence, and supersede that of duty. It therefore prohibits a party from purchasing on his own account that which his duty or trust requires him to sell on account of another, and from purchasing on account of another that which he sells on his own account. In effect, he is not allowed to unite the two opposite characters of buyer and seller, because his interests, where he is the seller or buyer on his own account, are directly conflicting with those of the person on whose account he buys or sells."

The same principle was well known to the civil law, and is probably a part of every enlightened system of jurisprudence. The magnitude of the inducement given Freer in the case now in question was such as that it would be difficult to believe Freer did or could have resisted its influence. And the principal, Anderson, being bound by the contract of his own agent, it matters not that disastrous results may fall upon those who are innocent so far as this particular fraud is concerned. I cannot, in view of any result which may follow, refuse to declare what seems to me plainly the law, and about which I have no misgiving whatever. So, without further discussion of this or any other point in the case, I feel constrained to hold that the bribery of Freer, as a matter of law, entitles the complainant to the relief sought. The sale is accordingly declared fraudulent, void, and rescinded, and decree will go against the executrix of John F. Anderson, deceased, for the full consideration paid, with interest from the date of payment, with the usual lien and account following a rescission. Just at this point I may say, in passing, without discussion, that I do not think there has been any such change of condition in the premises, by reason of the small amount of timber taken, as to constitute any obstacle to the relief to which the complainant is otherwise so clearly entitled. To so hold would be to allow time to sanction a secret fraud in nearly every case of importance.

In regard to Gonce's relation to the transaction I need say but little. He was fully aware of the fact that this tract of land had been placed in the hands of the real-estate agents for sale by his grandfather, and having consented thereto, and received a part of the consideration, and not having in any way repudiated the transaction after discovery of the bribery of Freer, he has adopted the transaction of the agents. It is not pretended, and could not be upon this record, that there was in fact any sale by him to Anderson, or that Anderson at any time had the least idea of buying the property from Gonce. In substance and for any practical purpose, it was a sale by Gonce to complainant, Alger; and having taken and retained the proceeds of the sale, and thereby the benefits of the entire transaction consummated through the real-estate agents, he is estopped to say that he is not connected with the fraud. He has fully adopted the transaction in taking the profits. I content myself upon this branch of the case by reference to Veazie v. Williams, 8 How. 134; Doggett v. Emerson, 7 Fed. Cas. 804; Mason v. Crosby, 16 Fed. Cas. 1024; Daniel v. Mitchell, 6 Fed. Cas. 1151; and the authorities stated above as sustaining the proposition that the principal is bound by the fraud of his agent. The law as declared in Mason v. Crosby, 16 Fed. Cas. 1016, has been accepted in subsequent cases, so far as I am aware, without question, and the statement of the law and the reasons on which it is founded, as contained in the opinions in these cases, have not been improved upon.

The recovery against Anderson will be declared a lien on the land belonging to Anderson, and embraced in the conveyance, and the recovery against Gonce will be declared a lien on the tract conveyed

by him separately; that is, upon a three-fourths undivided interest therein. The costs will follow the result of the suit as in ordinary cases.